**UNITED STATES of America,**
**Plaintiff,**

v.

**James ELKINS, Carol Elkins,**
**et al., Defendants.**

No. 96–20152 D.

United States District Court,
· W.D. Tennessee,
Western Division.

March 6, 2000.

James R. Garts, Jr., Harris, Shelton, Dunlap & Cobb, Memphis, TN, William D. Massey, Massey & McClusky, Memphis, TN, Michael J. Stengel, Stengel Law Firm, Memphis, TN, Paul D. Petruzzi, Black, Srebnick & Kornspan, P.A., Miami, FL, E.E. Edwards, III, Edwards & Simmons,Nashville, TN, for James Elkins.

A.C. Wharton, Jr., Wharton & Wharton, Memphis, TN, William D. Massey, Lorna S. McClusky, Memphis, TN, E.E. Edwards, Edwards & Simmons, Nashville, TN, Gerald F. Easter, Law Office of Gerald Easter, Memphis, TN, for Carol Elkins.

Carol Elkins, Memphis, TN, pro se.

Robert C. Irby, Law Office of Robert C. Irby, Memphis, TN, Sheila D. Brown, Law Office of Sheila D. Brown, for Jesus Morales.

Eugene A. Laurenzi, Agee, Allen, Godwin, Morris, Laurenzi & Hamilton, Memphis, TN, Robert C. Brooks, Law Office of Robert C. Brooks, Memphis, TN, for Raul Sandoval.

William C. Anderson, Jr., Anderson Law Firm, Memphis, TN, for Victor Saucedo.

T. Clifton Harviel, Jr., Federal Public Defender's Office, Memphis, TN, for Miguel Infante.

Lawrence W. Kern, Kern Law Firm, Memphis, TN, for Jose Infante.

Robert Miles Mason, Crone & Mason, PLC, Memphis, TN, for Juan Saucedo.

Matthew J. McDonald, Law Office of Mattew J. McDonald, Memphis, TN, for Artudo Infante.

Kathleen L. Caldwell, Taylor, Halliburton, Ledbetter & Caldwell, Memphis, TN, for Ricardo Sandoval, Jr.

Howard Brett Manis, Law Office of Howard Manis, Memphis, TN, for Roberto Sandoval.

Christopher E. Cotten, U.S. Atty's Office, Memphis, TN, for U.S.

## MEMORANDUM OPINION FOR ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO SUPPRESS

DONALD, District Judge.

Before the court are the motions of the defendants, James Elkins and Carol Elkins, to suppress evidence gained from searches of their various properties, which were conducted both without and pursuant to warrants.[1] The United States opposes the motions. Evidentiary hearings were conducted August 30–31, September 1–3, October 25–26, and 28, 1999, pursuant to *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). *See also United States v. Atkin*, 107 F.3d 1213 (6th Cir.1997). The parties filed contemporaneous post-hearing briefs on or about January 3, 2000. The defendants also filed supplemental authority. Thus, the matter is ripe for decision.

### FACTS

During 1996, certain officers of the Memphis Police Department Organized Crime Unit and the Federal DEA Drug Task Force received information about a marijuana grow at 155 Scott Street and the building behind Scott Street. An anonymous caller, believed to be the original tipster, also told the officers that marijuana was being grown at the Elkins home at 1270 Tutwiler (testimony of Dion Cicinelli). The tip regarding the marijuana grow was received from an individual allegedly stopped for speeding in exchange for potential "help" with the speeding citation. The individual relayed information about the marijuana grow but did not provide a basis for his knowledge. There is a conflict in the testimony over who actually received the information. Officer Duane Gary ("Gary") testified that he received the information from Lieutenant David Martello (Martello) and Martello stated that he received the information from another officer, Dion Cicinelli (Cicinelli). The officers admitted that they had no knowledge of the reliability of the citizen informant or whether this person had ever previously given information to the police. Indeed, some of the officers admitted that the informant was not reliable.[2] However, he was later paid for his information concerning 155 Scott Street. The primary police officers involved in the investigation were Gary, Joe Hoing (Hoing), Frank Bell (Bell), Cicinelli, and Martello.

During July and August of 1996, various police officers intermittently watched the addresses of 139/155 Scott Street[3] and conducted some preliminary investigation. The officers watched the addresses from five to ten times during the two month period.

During the periods the address was watched, generally late at night, the investigating officers testified that they observed "a lot of traffic in the area." The officers recalled seeing two vehicles on one occasion, and on another occasion they observed two Hispanic males in a pick-up truck which went to 146 Neil Street and an African–American male a short distance down the street from 146 Neil Street, but apparently were unable to question them.[4]

---

**1.** James Elkins filed the primary motion and Carol Elkins filed a supporting motion which joined in James Elkins' motion. In this order, references to Elkins, where appropriate, should be considered to include Carol Elkins.

**2.** One of the officers testified that it was his understanding that the informant was actually a burglar who had attempted to burgle 139 Scott Street.

**3.** They are the same building but have different addresses and entries.

**4.** The officers testified that the traffic was higher than would be expected for the times they were observing the address, which were when most of the other businesses were closed (except for possibly an ambulance service which was located a short distance away). However, the evidence offered by the

They also observed James and Carol Elkins arrive and leave several times during the course of the surveillance and also observed a number of off-duty police officers in the area of 155 Scott Street.[5] At one time, the officers spoke with James Elkins and he complained about the burglaries in the area. Elkins advised that he was employing off-duty police officers to provide security at his businesses at the Scott and Neil addresses. Elkins did not mention 2896 Walnut Grove. Elkins asked the officers to watch the area.

During the course of the investigation, Hoing checked with Memphis Gas Light and Water ("MGL & W") and discovered that at certain times of the year the utility bills of the addresses under surveillance were high. The officers did not indicate how high nor at what periods the bills were high. There was no testimony regarding utility checks made on the building at 2896 Walnut Grove prior to the August 22, 1996, search and seizure, although the affidavit for the warrant for 1270 Tutwiler issued on August 22, 1996, states otherwise. There were no references to the high utility bills in the affidavits applying for the warrants.

At some time prior to the application for and execution of the search warrants, a criminal records check performed on James Elkins revealed that he was a convicted felon. Apparently, the officers did not check any public records to determine if any business licenses were issued to Elkins for the addresses in question. However, the officers did observe large quantities of sheep manure (i.e., fertilizer) near the building at 146 Neil Street.

On or about August 19, 1996, during the surveillance of 155 Scott Street, Hoing testified that he met an Officer Tim Shields of the Memphis Police Department who was doing security work for Elkins. At that time, Hoing was accompanied by Bell and drug-detection dogs. Hoing testified that he had brought the dogs with him not to try and detect drugs but as a ploy[6] in the event the police were spotted.[7]

The investigation become more intense when Martello received a call from Internal Affairs on August 19, 1996, inquiring if there was a drug investigation occurring on Scott Street, as there were several off-duty officers working security there. As a result of this call, Martello decided to bring the investigation to the next level.

police is incomplete. The police present no recorded log of automobile tag numbers. Indeed, the police only present two specific observations of visitors: the two Hispanic males and the single African–American male. Further, except for the two Hispanic males, Cicinelli testified that he never saw any persons drive up to 139 and 155 Scott or 146 Neil Streets, not saw anyone go in and then leave during the course of the surveillance.

Martello stated under direct-examination that it was proper procedure when conducting a surveillance for officers to record the people and cars visiting a suspected site to enhance the credibility of the investigation. Apparently this was not done. Martello stated that four or five people visited Scott Street during the afternoon of August 20, 1996. However, these visits in themselves can hardly be considered suspicious as they occurred during normal business hours. Martello testified that, on the night of August 20, 1996, the only suspicious visitor to Scott Street was one of the off-duty police officers working security for Elkins—Charlie Smith ("Smith").

5. The presence of the off-duty police officers was reported to the police supervisors.

6. The ploy was that they were supposed to be training the dogs.

7. This testimony raises significant credibility questions as to the evidence offered by the police. The use of drug-detection dogs is a tool frequently employed by the police in all types of drug investigations. Yet Hoing stated that he did not take the dogs out of the cruiser. Bell verified this fact. Given the reliance the officers placed on their own sense of smell to obtain some of the warrants, it seems incredible that they did not run the dogs by the buildings being investigated in an attempt to gather evidence of the presence of marijuana. The court cannot help but wonder if the dogs were actually run by the buildings yet failed to detect any odor of marijuana, even though the officers claimed to have smelled a significant degree of it at various times during the investigation.

Cicinelli testified that sometime during the month of July, he received an anonymous call at the Organized Crime Unit, informing him that Elkins had a marijuana grow at 155 Scott Street, at the building behind Scott Street, and at his residence at 1270 Tutwiler Street. However, the record is devoid of any other information concerning this anonymous caller.[8] The timing and specificity of this anonymous caller and the coincidence of the call being forwarded directly to the appropriate investigating officer in a department the size of the Memphis Police Department raises significant credibility questions.

Several officers were watching the Elkins residence at 1270 Tutwiler through the night prior to August 21, 1996, in anticipation of speaking with James Elkins when he left for work in the morning. At the same time, several other officers, including Martello, Bell, Hoing, and Captain Terry Livingston ("Livingston") of the Tennessee National Guard, were surveilling $^{139}/_{155}$ Scott Street. During the surveillance, the officers observed one of the off-duty police officers, Smith, working security at the Scott addresses. This occurred after midnight on August 21, 1996. Martello testified that he informed Smith of their suspicions concerning drug activity in the area. Smith informed the officers that he was also guarding another Elkins property, 2896 Walnut Grove, and offered to admit them to that address. Smith led the officers to the Walnut Grove address, but Martello declined to enter. Smith report-

ed no suspicious activity at Walnut Grove nor any other Elkins properties. The officers testified that this was the first time that 2896 Walnut Grove came to their attention in relation to their investigation of Elkins.[9]

At two points during the investigation, members of the Tennessee National Guard assisted the officers with the loan of a thermal imager and personnel. On August 6, 1999, Livingston and other personnel used the thermal imager at 139/155 Scott Street and 146 Neil Street. Livingston testified that it was possible that he obtained a heat indication but that they had to cease operations because they were apparently spotted by someone.

On the evening of August 20, 1996, the thermal imager was used by Hoing, Bell, and Livingston[10] at $^{139}/_{155}$ Scott Street and 146 Neil Street. A positive heat indication was received for 146 Neil Street. After Smith took Bell and Livingston to 2896 Walnut Grove, the thermal imager was used there, also. A police helicopter, also equipped with a thermal imager, flew over 2896 Walnut Grove and reported a positive heat signature.[11]

The building at 2896 Walnut Grove had razor-wire around part of the top of it and had a number of shiny aluminum vents or ducts on top of it. The officers testified that they observed light originating from inside the building reflecting from the ducts or vents. There was a light on top

8. Cicinelli, in testimony at the hearing, stated that the anonymous caller was "definitely" the speeder who had originally given the tip about 155 Scott Street. However, on cross-examination, Cicinelli could present no fact which would justify such an assumption.

9. Concerning the warrant issued for 2896 Walnut Grove, Bell admitted that he had no information as to an indoor marijuana grow at that address at that time. Further, Cicinelli testified that he never went to 2896 Walnut Grove until the date of the execution of the warrant.

10. Hoing had attended a one week Drug Enforcement Administration ("DEA") school

training him how to use a thermal imager. Under cross-examination at the hearing, he admitted that he was not a certified thermographer. Bell attended a three day DEA training seminar on how to use a thermal imager, and was certified to use it, as was Livingston.

11. Livingston testified that he made a recording of the imaging conducted with the hand-held imager and that he gave the tape to Bell. However, that tape has not been produced. Further, the testimony indicated that it was normal practice for the helicopter crew to make a tape recording of thermal imaging, but apparently the pilot forgot to place a tape in the recorder.

of the exterior of the building over the location of a PVC pipe on the east wall. There were "No Trespassing" signs on the building. On the east side of the building was a worn path apparently used to gain access to an apartment building behind the Elkins property.

Bell observed a PVC pipe protruding from the east side of the building, about two-three feet up from the ground, with bright light emitting from a gap, approximately an inch wide, around the pipe.[12] Bell testified that prior to bending down and looking through the gap around the PVC pipe, he did not smell any marijuana. Bell testified that through the gap he could see marijuana plants, and he could hear ballasts.[13] Livingston also saw the light from the gap around the pipe and testified that he could smell a strong odor near the pipe, which he could not identify, and that he could see green leaves through the gap. Hoing testified that he came over to 2896 Walnut Grove on Bell's request and made the same observations as Bell. Bell and Livingston walked the exterior of the building using the thermal imager to gain a heat signature.

Across the street from 2896 Walnut Grove was an MLG & W power sub-station which was emitting electrical noise. There were also power lines next to 2896 Walnut Grove. Bell admitted that he heard ballasts from the power station but was able to distinguish that sound from the sound of the ballasts emitting from inside the building. Bell believed that the ballasts in the building were evidence of an indoor growing operation. Bell acknowledged, however, that ballasts do have commercial applications besides powering high wattage lights used to grow marijuana.

In the early morning on August 21, 1996, around 8:00 or 9:00 a.m., Officers Gary, Hoing, and Cicinelli approached the Elkins' residence at 1270 Tutwiler to question the Elkins about the possible marijuana grow at 155 Scott Street. Carol Elkins invited the officers inside and gave them a tour. The officers obtained permission from Carol Elkins to search 1270 Tutwiler and 155 Scott Street. The officers testified they smelled the strong odor of marijuana in the Elkins home.

James Elkins gave the officers permission to search the Scott Street properties and then led them to Scott Street. The officers left Carol Elkins at 1270 Tutwiler and did not leave an officer at the house to secure it or watch Carol Elkins.[14] En-

12. Photographs of the gap around the pipe were admitted into evidence. An examination of these photographs shows that any gap around the pipe is clearly less than an inch.

13. Ballasts are transformers which are used for, *inter alia*, high wattage lamps.

14. A significant credibility issue is raised concerning the fact that officers left Carol Elkins, a very likely suspect in this entire drug investigation, alone in the house where all of the officers allegedly smelled the strong odor of marijuana. Indeed, at the hearing Cicinelli would only admit, after being admonished by the court for evasive answers, that it was proper police procedure to leave an officer guarding a place where there is a strong odor of marijuana present to prevent destruction of evidence while a warrant is being obtained.

Cicinelli raised officer safety as a reason for not leaving an officer at the scene. However, the fact that there were three officers at the scene and the fact that the Elkins were coop-

erating and not presenting any indicators of danger, severely undermine this claim.

This failure of the police to leave an officer to secure the premises is even more incredible given that Hoing admits that, prior to leaving with the officers, James Elkins had a private conversation with Carol Elkins, who stayed behind. If the officers, in fact, smelled the strong odor of marijuana at the residence, then observed James Elkins have a private conversation with Carol Elkins, and then left Carol Elkins alone at the residence, a reasonable conclusion would be that it is quite likely that Carol Elkins would destroy any evidence of the marijuana present.

Hoing claimed that he did not have the manpower to leave someone at 1270 Tutwiler. However, he had two other officers (Gary and Cicinelli) with him and James Elkins was cooperating. Further, Martello testified that Bell and at least three other police officers and at least one other National Guardsman were at the various locations involved in the

route to 155 Scott Street, James Elkins took a circuitous route.

On arrival, the police officers searched 155 Scott Street and found nothing. There were several people inside, including a former Memphis police officer, Mike Williams. After searching 155 Scott Street, the officers asked James Elkins if they could search 139 Scott Street.[15] Elkins' affidavit indicates that he initially resisted the request although the officers testified that he verbally agreed to the search of 139 Scott Street.[16] The officers and James Elkins then exited 155 Scott Street and proceeded to 139 Scott Street. Elkins testified that Hoing had hold of him by the arm and was guiding him.

Upon exiting 155 Scott, the officers observed a Cadillac next to James Elkins vehicle. The Cadillac was identified as the one belonging to Carol Elkins seen at 1270 Tutwiler that morning.

The officers testified that they asked James Elkins to unlock the door to 139 Scott Street. Elkins indicates that the officers were becoming loud and excited. He tried several keys, none of which fit the lock. Elkins told the police that his wife had the key. He then knocked on the door at 139 Scott Street and called to his wife to open the door. Elkins and the officers then went to the side door of 139 Scott Street and Carol Elkins opened the door.

The officers and James Elkins went inside. The officers stated that they could then smell the odor of marijuana inside

139 Scott Street. They also observed and found laundry detergent, chemicals, fertilizer, scales, piping, large plastic bags, and ledger sheets. Some of the plastic bags contained the remains of marijuana plants. A search of the cabinets inside 139 Scott Street yielded several metal trays which contained marijuana. One of the officers testified that the amount of marijuana was approximately two pounds. The officers searched the attic space of 139 Scott Street and found a number of lights which could be used in the growing of marijuana.

At some point during the search, the officers determined that there was a void between 139 Scott Street and 155 Scott Street, indicating the presence of a secret room. Elkins confirmed the existence of a secret room to which there was no entry. He advised that a hole would have to be knocked in the wall to gain entry. The officers then started to knock a hole in the wall but Elkins directed them to another spot in order to preserve the integrity of the space. Inside the secret room the officers discovered an elaborate system of lights, pots, vats, tubing, fans, and other paraphernalia typically used in a marijuana grow. Marijuana leaves were strewn about the room.

After the search of 139/155 Scott Street, the officers asked for permission to search 146 Neil Street. Elkins declined and asked to speak with his attorney. Elkins then attempted to contact his attorney without success. Elkins then advised the officers to "do what [they] had to do."

investigation. It stands to reason that two of the officers present at 1270 Tutwiler could have easily searched 155 Scott Street while one officer was left behind at 1270 Tutwiler with Carol Elkins. Indeed, this omission on the part of the police is highlighted by the fact that, several hours later, they called for an officer to be stationed at 1270 Tutwiler for security reasons. It certainly stands to reason that, if they in fact did smell a strong odor of marijuana at 1270 Tutwiler, they would have called for an officer immediately.

**15.** The building at 139 Scott Street is part of the same building as 155 Scott Street, but they have different addresses and different entries. Each address is clearly labeled with the appropriate street number.

**16.** The police videotaped and photographed the entry search of 139 Scott Street. However, Elkins' alleged verbal consent to the search to 139 Scott Street is noticeably absent from the video. Further, on cross-examination, Cicinelli admitted that the Memphis Police Department has and uses written "Consent to Search" forms. The record is noticeably devoid of any such forms signed by Elkins.

Hoing testified that at the point marijuana was found at Scott Street, the Elkins were under arrest, although there is uncertainty as to exactly when they were placed in handcuffs and into a cruiser. The officers testified that James Elkins then offered them the key to 146 Neil Street and 2896 Walnut Grove, asking that they not damage the property. James Elkins, however, testified that the keys were taken from him after he was handcuffed and placed in the cruiser. Apparently, he also told the police about a garage door opener to 146 Neal Street over the visor of his car.

The Elkins were then transported to the station about 11:00 a.m. and the officers began to prepare the warrants for the 146 Neil Street, 1270 Tutwiler, and 2896 Walnut Grove locations. The officers finished typing the warrants about 3:00 p.m. and obtained a judge's signature at approximately 4:00 p.m.

During this time period, Bell and Captain Livingston were surveilling 2896 Walnut Grove, while waiting for a warrant. At approximately noon, they observed two Hispanic males drive up to 2896 Walnut Grove. The officers then drove up to the building to detain the two men, when one of the Hispanics exited the car and entered the building. The officers claimed that the detention was to prevent the possible destruction of evidence. As they took custody of the one still outside, the man who went inside exited the building, saw the detention, went back inside, and locked the door.

The officers on the scene, fearing the destruction of evidence, called for back-up and contacted an experienced state prosecutor to ascertain whether they could enter the building and detain the other person. They were advised that they should enter the building to detain the man but then exit and wait for the warrant. They were also advised that they could not use anything they saw in the building in the warrant application. Bell testified that he made no observations, visual or auditory,

that indicated evidence was being destroyed. The officers subsequently forced the door and seized not only the original man they viewed, but three other men. After detaining the individuals, the officers exited the building. While inside, they observed a large quantity of marijuana and two shotguns.

The officers then learned that there may still have been two other men in the building. They went back in but could not locate them, so they called for a dog. The dog arrived and the officers went back into the building. They found and detained two other men who had apparently been hiding in the ceiling. At that point, they exited the building to wait for the warrant.

Once the warrant arrived, a search was conducted of the building. A large quantity of marijuana (approximately 1300 marijuana plants) and growing equipment, including 158 high intensity bulbs, was seized.

Gary took a team of officers to 146 Neil Street to execute the warrant for that address. After knocking on the door and receiving no answer, the officers entered and discovered a marijuana grow consisting of 320 live marijuana plants and 700 hanging plants. A short time later, an Hispanic man was observed looking through a hole in the wall. The officers went through the hole, arrested two men in a living area, and also found a shotgun and a crossbow.

Cicinelli went to 1270 Tutwiler with some other officers to execute the warrant for that address on August 21, 1996. In the course of the search, the officers found a dormant grow in the attic, four pounds of marijuana inside a wall in a plastic bag, $24,000 cash in a box in the master bedroom, and about 253 grams of cocaine in a bucket on the stairway to the attic. This search was videotaped by the police.

On August 22, 1996, Officers Tate and Davidson of the Memphis Police Department were dispatched to 1270 Tutwiler to obtain numbers from off the house and to

arrange for the towing of the cars that were located there. Tate testified that when they arrived he observed a pipe protruding from a cement retaining wall onto the sidewalk. The pipe appeared to lead to 1270 Tutwiler. Both Tate and Davidson testified that they, upon sniffing the pipe, smelled the odor of marijuana emitting from the pipe. As a result of Tate's observations another affidavit in application for a warrant to search 1270 Tutwiler was completed by Tate and Lieutenant Oliver of the Memphis Police Department. Oliver admitted that he relied on Tate's credibility in preparing the affidavit.

The second search warrant for 1270 Tutwiler was based on the alleged smell of marijuana from the pipe in the retaining wall. The police thought that there might be another hidden compartment containing a marijuana grow at the house. The police utilized the proprietor of a company specializing in hidden safes to determine if a hidden compartment existed. The search yielded no such additional secret room.

## ISSUES

The Elkins present five issues to the court: 1) whether the use of a thermal imager constitutes a search within the scope of the Fourth Amendment; 2) whether the police established that James Elkins voluntarily gave his consent for the search at 139 Scott Street; 3) whether exigent circumstances existed for the police to enter 2896 Walnut Grove without a warrant; 4) whether the police violated the knock and announce rule prior to executing the search warrant at 146 Neil Street; and 5) whether the affidavits supporting the issuance of the warrants are valid.

## ANALYSIS

During the course of the hearing, the court accepted expert testimony from Charles Stowall [17] and Dr. Mark Driver, [18] who testified for the United States and the Elkins, respectively, on, *inter alia*, the thermal imager and the HVAC system used at 2896 Walnut Grove. The court has examined the objections to the expert testimony raised by both Elkins and the United States and declines to reconsider its previous holdings on the matter. The court will now address the issues, *seriatim*.

### Issue 1—Thermal Imagery and the Fourth Amendment

■ The court will first address the issue of whether the use of a thermal imager constitutes a search within the scope of the Fourth Amendment. The Fourth Amendment protects a person's reasonable expectation of privacy against government intrusion under the test enunciated in *Katz v. United States*, 389 U.S. 347, 361, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring), which was subsequently formally adopted in *Smith v. Maryland*, 442 U.S. 735, 739–41, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979). *See also California v. Ciraolo*, 476 U.S. 207, 211, 106 S.Ct. 1809, 90 L.Ed.2d 210 (1986); *United States v. Padin*, 787 F.2d 1071, 1075 (6th Cir.1986). The test is based upon a reasonable expectation of privacy and consists of the following two prongs: 1) the defendant must exhibit a subjective expectation of privacy and 2) the expectation must be objectively reasonable. If a person's reasonable expectation of privacy has been infringed by the action of the government, then a

---

17. Stowall was employed by the Los Angeles County Sheriff's Department for 9 years and for 23 years by the DEA. He testified that he has taught over 60 courses on the use of the thermal imager to various law enforcement agencies and that he has testified as an expert on thermal imaging in over 50 cases.

18. Driver holds a Ph.D. in aeronautical engineering and he was employed by the U.S. Air Force in engineering for eight years. Then he

taught mechanical engineering at Memphis State and now at Christian Brothers University, where he is the chair of the Mechanical Engineering Department. He testified that his primary areas of expertise are thermal systems (including HVAC systems), heat transfer, and fluid mechanics. He has been published a number of times in professional journals. He testified that he has previously testified as an expert witness in court.

search, for purposes of the Fourth Amendment, has occurred. Unless some recognized exception exists, a warrant must be obtained prior to conducting a search. In the instant case, the government used a thermal imager to monitor several of the defendant's properties.

A thermal imager has the capability of measuring heat gradients or, in other words, the difference in surface temperatures between objects or different parts of the same object (*i.e.,* a wall). Essentially, it is a sophisticated heat sensor. The testimonial evidence presented at the hearing indicated that the thermal imager used in this case did not have the capability to "penetrate" the walls of buildings and reveal, with any degree of accuracy, specific activities occurring inside.[19]

Most of the circuits ruling on this issue to date have held that use of a thermal imager does not constitute a search within the meaning of the Fourth Amendment. *See United States v. Kyllo,* 190 F.3d 1041 (9th Cir.1999); *United States v. Robinson,* 62 F.3d 1325 (11th Cir.1995), *cert. denied,* 517 U.S. 1220, 116 S.Ct. 1848, 134 L.Ed.2d 949 (1996); *United States v. Ishmael,* 48 F.3d 850 (5th Cir.1995), *cert. denied,* 516 U.S. 818, 116 S.Ct. 74, 133 L.Ed.2d 34 (1995) (though the defendants had a subjective expectation of privacy, the use of a thermal imager was not unreasonable because it did not disclose intimate details or intrude in to the privacy of their premises); *United States v. Myers,* 46 F.3d 668 (7th Cir.1995), *cert. denied,* 516 U.S. 879, 116 S.Ct. 213, 133 L.Ed.2d 144 (1995) (defendant had no reasonable expectation of privacy in heat emitted from his residence); *United States v. Pinson,* 24 F.3d 1056 (8th Cir.1994), *cert. denied,* 513 U.S. 1057, 115 S.Ct. 664, 130 L.Ed.2d 598 (1994).

The basis of the *Myers* case was the Indiana State Police's use of a thermal imager on the defendant's residence. Based upon the positive heat readings detected by the thermal imager, in conjunction with a high utility bill, the lack of trash left in front of the defendant's residence, and a suspicious purchase by the defendant, the State Police obtained a warrant to search his residence, which resulted in the discovery of a marijuana grow. *Myers,* 46 F.3d at 668–69. The defendant moved to suppress the evidence. The *Myers* court held that the defendant had no reasonable expectation of privacy as the defendant had failed to try to conceal the heat and the heat constituted "waste," analogous to garbage left at the curbside or smoke rising from a chimney or odors emanating from luggage. *Id.* at 670. Further, the *Myers* court held that the use of the thermal imager did not intrude in any way into the sanctity of the home, nor did it affect the intimacy, personal autonomy, and home privacy interests of the defendant. *Id.*

The underlying facts of *Pinson* were similar in that an aerial thermal imager was used on a residence and its use challenged by the defendant. The holding of *Pinson* was almost identical to *Myers,* except for the wording of the decision. *Pinson,* 24 F.3d at 1058–59. Indeed, the *Myers* court cited to *Pinson* and used the same reasons in justifying its decision.

The facts in *Robinson* were also similar in that an aerial imager was used on a residence to establish probable cause for a search warrant for marijuana. The defendant's motion to suppress the evidence was denied. The Eleventh Circuit, upholding the use of a thermal imager as constitutional, also relied on the waste heat pos-

**19.** However, the court notes that another decision has recognized that the state of thermal image technology in 1994 could detect a human form through a curtain or leaning against a plywood door, indicating that it would be possible to discern two people in bed at night and accurately conclude what

was happening. *United States v. Cusumano,* 67 F.3d 1497, 1504 n. 11 (10th Cir.1995), *vacated on other grounds,* 83 F.3d 1247 (10th Cir.1996) (*en banc*). Further, the same court noted that the data gathered by a thermal imager could be used to identify mundane activities. *Id.* at 1505 n. 14.

ture, noting that the defendant had failed to take any steps to reduce the heat emitted from his house. *Robinson*, 62 F.3d at 1328–29. Further, the *Robinson* court analogized the use of a thermal imager, for Fourth Amendment purposes, to the use of drug-detection dogs.

The circumstances in *Ishmael* were somewhat different. A thermal imager was used to support an application for a search warrant for marijuana. It was not used on the defendant's residence but on an adjacent building. Its use was challenged by the defendant. The Fifth Circuit held that the use of the thermal imager did not violate the Fourth Amendment because intimate details of activities within the home were not revealed. *Ishmael*, 48 F.3d at 855–56.

The *Kyllo* court, upholding a search warrant of a residence based upon thermal imaging, employed similar reasoning that the use of a thermal imager was permissible because its use did not reveal detailed images of private activity within the home. *Kyllo*, 190 F.3d at 1047. However, it should be noted that both the *Ishmael* and *Kyllo* courts discussed the use of advanced technology potentially violating the Fourth Amendment. *See also Dow Chemical Company v. United States*, 476 U.S. 227, 238–39, 106 S.Ct. 1819, 90 L.Ed.2d 226 (1986).

The concern of the Fifth and Ninth Circuits on the issue of technological capability in the context of the Fourth Amendment was thoroughly addressed in a decision of the Tenth Circuit, which was overruled on other grounds. *United States v. Cusumano*, 67 F.3d 1497 (10th Cir.1995), *vacated on other grounds*, 83 F.3d 1247 (10th Cir.1996) (*en banc*).[20] *Cusumano* addresses whether the warrantless use of a thermal imager to detect heat emanations from a defendant's residence is a search under the Fourth Amendment. The *Cusumano* court opined that the thermal imager did not detect "waste heat." Rather, the device measures heat differentials and creates a heat signature. *Id.*

■ In *Cusumano*, the court stated that other circuits upholding the use of a thermal imager had misframed the question. The inquiry should be focused on the *object* of the government's inquiry and not on the tools that the government employs to obtain information. Thus, the pertinent inquiry should not be whether the defendants have an expectation of privacy into the waste heat radiated from their homes, but whether they have an expectation of privacy in activities within their homes, which may very well be revealed by heat signatures. *Id.* at 1502.

The court presented an extensive analysis of the dangers of technological advances to the Fourth Amendment and privacy. The court opined that although thermal imaging, in its current state of advancement as employed in this case (and the instant matter),[21] arguably cannot reveal specific details of particular activity within a home, the interpretation of the data that is obtained through the use of the thermal imager can reveal activities for which defendants would have a reasonable expectation of privacy. *Id.* at 1504 n. 11 and 1505 n. 14.

Thus, the focus of the analysis should not be on how intrusive the means of gathering the information (*i.e.*, the search) but on the object of the search (*i.e.*, the activity within the home). Technology, the court noted, no matter how passive or non-

---

**20.** The analysis employed by *Cusumano* has been cited with approval in a very recent decision of the Pennsylvania Supreme Court holding the use of a thermal imager is a search under the Fourth Amendment. *Commonwealth v. Gindlesperger*, 743 A.2d 898 (Pa. 1999).

**21.** The court makes no conclusion as to the existence of more advanced technology based upon thermal imaging which would reveal specific activities within a home.

intrusive,[22] can still constitute a violation of a reasonable expectation of privacy.[23] *Id.* at 1503. The government may not use technological innovations to encroach upon the reasonable expectation of privacy within the home.[24] *Id.* at 1505. In contrast, the decisions of the other circuits seem to focus on *what* activity is being protected (*i.e.*, intimacy).[25] *Cusumano*, however, focuses on the fact that the activity is occurring within the home, which is one of the touchstones of the Fourth Amendment. Thus, focusing on the requirement of a reasonable expectation of privacy, it would seem to follow that, depending upon the circumstances, the use of a thermal imager may or may not be permissible under the Fourth Amendment.

It is instructive to acknowledge that the *Cusumano* court warned against allowing the rights protected by the Fourth Amendment to fall victim to a technological race between the government and the people, as this is a race the people shall most certainly lose. *Id.* at 1504. Indeed, with the advancements in technology today, the court noted that to rule otherwise would require every individual, to maintain his privacy and protect against government incursions, to employ a plethora of advanced technological protections. *Id.* at 1503. Such a ruling would be unreasonable for all but the most wealthy and would be anathema to the Fourth Amendment. Indeed, as Justice O'Connor has stated, the people should not be required to take more than customary precautions to maintain their privacy. *Florida v. Ri-*

*ley*, 488 U.S. 445, 454, 109 S.Ct. 693, 102 L.Ed.2d 835 (1989) (O'Connor, J., concurring).

The first prong of the reasonable expectation of privacy test is whether the defendant had a subjective expectation of privacy. *Katz*, 389 U.S. at 361, 88 S.Ct. 507; *Smith*, 442 U.S. at 740, 99 S.Ct. 2577. *See also United States v. Padin*, 787 F.2d 1071, 1075 (6th Cir.1986).

■ In this matter, it is apparent that the Elkins had a subjective expectation of privacy in the activity occurring inside the buildings. The marijuana grows were inside the buildings, beyond the scope of prying eyes. The locations were secured and posted with "No Trespassing" signs. Indeed, Elkins took the additional security precaution of hiring off-duty police officers. Thus, it would seem that the first prong of the test has been met. However, whether Elkins had a subjective expectation of privacy in the heat signature created by heat emanating from the building must also be examined.

Other circuits have held that the first prong of the test is not met with regard to the "waste" heat detected by the thermal imager. *See, e.g., United States v. Robinson*, 62 F.3d 1325 (11th Cir.1995), *cert. denied*, 517 U.S. 1220, 116 S.Ct. 1848, 134 L.Ed.2d 949 (1996). However, in accordance with the *Cusumano* decision, the court will focus its reasonable expectation of privacy analysis not on the method used by the government to obtain the evidence, the thermal imager, but on the object of the government's search, the activity with-

---

**22.** For example, a wiretap which requires a warrant is passive and, arguably, non-intrusive.

**23.** It is well established that there need not be a physical intrusion for a violation of privacy or the Fourth Amendment. *Katz v. United States*, 389 U.S. 347, 351–52, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967); *United States v. Padin*, 787 F.2d 1071, 1075 (6th Cir.1986).

**24.** Indeed, as far back as 1928, Justice Brandeis warned against the danger to privacy posed by advancing technology. *Olmstead v. United States*, 277 U.S. 438, 474–79, 48 S.Ct.

564, 72 L.Ed. 944 (1928) (Brandeis, J., dissenting). With the rapid advancements in technology up to this date, there is every reason to be even more cognizant of Justice Brandeis' warning.

**25.** As the Tenth Circuit accurately recognized, mundane activities within the home are just as much none of the government's business as are intimate activities. *United States v. Cusumano*, 67 F.3d 1497, 1505 n. 14 (10th Cir. 1995), *vacated on other grounds*, 83 F.3d 1247 (10th Cir.1996) (*en banc*).

in the buildings.[26] The rationale for this perspective is that the Fourth Amendment is intended to protect people, their effects, and their activities for which they have a reasonable expectation of privacy. As the heat signature on the outside of the buildings revealed basic information as to the activity occurring inside the building, albeit not a complete picture of the activity, it follows that the Elkins had a reasonable expectation of privacy in the heat signature concerning that activity. Thus, the first prong of the test has been met.

█ The second prong of the test is whether society would objectively recognize the defendant's subjective expectation of privacy as reasonable. *Katz*, 389 U.S. at 361, 88 S.Ct. 507; *Smith*, 442 U.S. at 740, 99 S.Ct. 2577. *See also United States v. Padin*, 787 F.2d 1071, 1075 (6th Cir. 1986). Examining this situation with the focus on the object of the government's search, the Elkins' subjective expectation of privacy was objectively reasonable because the activity in question was within an elaborately secured building. As the buildings were not the Elkins' home, but were his places of business, it could be argued that he had a lesser expectation of privacy. Nonetheless, the Fourth Amendment protections apply to the reasonable expectation of privacy therein, as explained, *infra*.

The Supreme Court has traditionally granted great deference to the home as a place of refuge and sanctuary and has liberally applied the protections of the Fourth Amendment to it. *See, e.g., United States v. Karo*, 468 U.S. 705, 714, 104 S.Ct.

3296, 82 L.Ed.2d 530 (1984); *Payton v. New York*, 445 U.S. 573, 590, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980); *Silverman v. United States*, 365 U.S. 505, 511, 81 S.Ct. 679, 5 L.Ed.2d 734 (1961). These Fourth Amendment protections have been traditionally extended to the "curtilage" which is the immediate area surrounding the actual home. *United States v. Dunn*, 480 U.S. 294, 300, 107 S.Ct. 1134, 94 L.Ed.2d 326 (1987); *Oliver v. United States*, 466 U.S. 170, 180, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984); *Hester v. United States*, 265 U.S. 57, 59, 44 S.Ct. 445, 68 L.Ed. 898 (1924).

With regard to commercial facilities and the Fourth Amendment, curtilage is more problematic. The Supreme Court has recognized that there is a societally recognized reasonable expectation of privacy within the interior of commercial buildings, although there are exceptions which would normally not be applicable to residences, such as administrative warrants. *Dow Chemical Company v. United States*, 476 U.S. 227, 236, 106 S.Ct. 1819, 90 L.Ed.2d 226 (1986); *See See v. City of Seattle*, 387 U.S. 541, 545–46, 87 S.Ct. 1737, 18 L.Ed.2d 943 (1967). Thus, concerning the Elkins' buildings where the marijuana grows were located, it would appear that they had an objectively reasonable expectation of privacy as the grows were inside secured commercial buildings. Therefore, the Elkins have met the second prong of the test for determining whether their expectation of privacy is objectively reasonable. *Katz*, 389 U.S. at 361, 88 S.Ct. 507; *Smith*, 442 U.S. at 740, 99 S.Ct. 2577. *See also Unit-*

26. The court acknowledges the analogies presented by the other circuits in support of upholding the validity of searches with thermal imagers which included the placing of garbage on the street and the use of dogs to sniff illegal drugs. The analogy to garbage placed on the street is rejected because in that situation, the defendant purposely gave up his right to privacy by placing the garbage on the curbside for disposal. Heat gradients on the side of a building are not things that a defendant would intentionally place in the public view. The analogy to the dog sniffing for

illegal drugs is also rejected for two reasons: the only substance the dog will detect is the illegal drugs and such a "search" does not occur within the protected confines of the home. The thermal imager does not just detect illegal activity. It also detects a variety of mundane activities which are legal. Indeed, it can be reasonably concluded that most of what a thermal imager detects is legal. Further, it usually occurs in a public place, such as at an airport or during a traffic stop, where there is a lesser expectation of privacy than in a secured building.

*ed States v. Padin*, 787 F.2d 1071, 1075 (6th Cir.1986).

■ Applying the reasonable expectation of privacy for the activity within the Elkins' buildings to the use of the thermal imager, the court must conclude that it was a search within the scope of the Fourth Amendment.[27] The use of the thermal imager revealed information about the activity inside the buildings which the Elkins had reasonably attempted to conceal from prying eyes. As the police did not have a warrant nor exigent circumstances, the use of the thermal imager must be held to be an improper search.

It may be argued that the use of the thermal imager only legitimately enhances the natural abilities of the police to observe what normally exists (*i.e.*, heat radiations) and is, therefore, permissible. The court does not dispute that certain enhancements of natural abilities are proper in the scope of law enforcement. *See, e.g., Texas v. Brown*, 460 U.S. 730, 740, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983) (plurality opinion) (holding that the use of binoculars to enhance vision is constitutional). *See also United States v. Booker*, 461 F.2d 990, 992, (6th Cir.1972). However, heat radiations which are detected by a thermal imager are not normally viewable by the unaided naked eye. At least one recog-

nized commentator argues that current law concerning the artificial extension of human senses by technical means indicates that such an extension is a search within the meaning of the Fourth Amendment. *See* 1 Wayne R. Lafave, *Search and Seizure* § 2.2(d) (West 1996 & Supp.1999) (citing, in support, *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967); *United States v. Epperson*, 454 F.2d 769 (4th Cir.1972) (holding that the use of a magnetometer in certain circumstances is a search within the meaning of the Fourth Amendment); and *State v. Young*, 123 Wash.2d 173, 867 P.2d 593 (1994) (holding that the use of a thermal imager is a search under the Fourth Amendment because it gathers information about the home that could not be gathered with the naked eye)).[28] This principle is reinforced by a decision of the United States Supreme Court which held that merely tracking the location of an electronic beeper within the confines of a residence violated the reasonable expectation of privacy guaranteed by the Fourth Amendment. *United States v. Karo*, 468 U.S. 705, 714, 104 S.Ct. 3296, 82 L.Ed.2d 530 (1984). The information which can be gathered by a thermal imager is at least as qualitatively intrusive as that relayed by the location of an electronic beeper.

---

27. The government argues that it took no direct action and committed no "intrusion" when it employed the thermal imager and, thus, that no violation of the Elkins' reasonable expectation of privacy occurred. The argument is without merit. As previously noted, an "intrusion" for the purposes of the Fourth Amendment need not involve physical transgression of a space. An intrusion for the purposes of the Fourth Amendment occurs when a reasonable expectation of privacy has been violated. The decisions of the United States Supreme Court clearly hold that there is a reasonable expectation of privacy in the interior of a commercial building. The information gathered by a thermal imager reveals, at the least, the nature of the activity inside the buildings by virtue of the heat signature on the exterior of the building.

It is interesting to note that several of the previously discussed decisions of the circuit

courts which have upheld the use of a thermal imager as non-intrusive focused on the fact that the thermal imager did not project any rays or beams into the residence. *See Myers*, 46 F.3d at 669; *Pinson*, 24 F.3d at 1058; *Robinson*, 62 F.3d at 1330 n. 7; *Ishmael*, 48 F.3d at 856. Relying on this rationale for finding that there was no intrusion is faulty based upon the previous holding of the United States Supreme Court and the United States Code that a wiretap, which also does not intrude in this manner, is a search requiring a warrant. *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967); 18 U.S.C. §§ 2510 *et seq.*

28. However, this commentator acknowledges that some exceptions are permitted where there is a search for a specific item of contraband. *Id.* (discussing, *inter alia*, the use of magnetic tags to deter shoplifting and the use of ultraviolet lights).

If technological artificial extensions of the human senses are permissible, then the door would be opened to allow technological advancements which permit a person to listen to a conversation in a closed room without violating the Fourth Amendment. This danger is demonstrated by the fundamental inconsistencies between holding that the gathering of excess sound emanations (*i.e.*, by wiretaps, etc.) is unconstitutional while the gathering of excess heat radiations (*i.e.*, by thermal imagers) is not. Other decisions, decided years ago when thermal imagery technology was not nearly as advanced as it is today, recognized that the data gathered by thermal imaging does not focus on just illegal activity or contraband but reveals a host of mundane and otherwise legal activities. *See, e.g., United States v. Cusumano*, 67 F.3d 1497 (10th Cir.1995), *vacated on other grounds*, 83 F.3d 1247 (10th Cir.1996) (*en banc*); *United States v. Field*, 855 F.Supp. 1518 (W.D.Wis.1994). History has proven, time and again, that law enforcement will employ intrusive technology until a definitive guideline has been established. *See, e.g., Olmstead v. United States*, 277 U.S. 438, 48 S.Ct. 564, 72 L.Ed. 944 (1928), *overruled by, Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). Technological advancements cannot be allowed to defeat the protections of the Bill of Rights.

It may be argued that this holding will prevent law enforcement from ever using a thermal imager when it is needed. This argument must be balanced against traditional constitutional protections of the Fourth Amendment. Where the government seeks to capture a heat signature for law enforcement purposes in the face of a reasonable expectation of privacy (*e.g.*, a home), the police will simply have to obtain a warrant. This is far from an onerous requirement. Such a requirement will inhibit the indiscriminate use of thermal imagers and lend substance to the Fourth Amendment.

In the instant matter, it is evident that Elkins had a reasonable expectation of privacy in the buildings in question and in the heat signature created by heat emanating from the building. Having found that the use of a thermal imager constitutes a search, the warrant requirement applies. It is undisputed that the police did not obtain a warrant for the use of the thermal imager. Accordingly, any evidence obtained exclusively by the use of the thermal imager will be suppressed.[29] Moreover, any testimony regarding thermal imaging is excluded from the trial as fruit of the poisonous tree. *See Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

*Issue 2—Voluntary Consent of Elkins to Search 139 Scott Street*

■ The second issue raised by Elkins is whether his consent to the search at 139 Scott Street was voluntary.[30] It is well established law that a search may be conducted without a warrant if a person with

---

29. The notes that this ruling has significant support from not just *Cusumano* and *Field*, but several state supreme courts which have considered the issue. *State v. Young*, 123 Wash.2d 173, 867 P.2d 593 (1994); *State v. Siegal*, 281 Mont. 250, 934 P.2d 176 (1997), *overruled on other grounds, sub nom., State v. Kuneff*, 291 Mont. 474, 970 P.2d 556 (1998); *Commonwealth v. Gindlesperger*, 743 A.2d 898 (Pa.1999).

30. There appears to be some dispute as to whether 139 and 155 Scott Street are the same address for the purposes of consent to search as they are, arguably, the same building. The court will consider them to be different addresses, analogizing them to the example of an apartment building, for the purposes of this issue as they did have separate addresses and apparently required separate keys to access them. *See United States v. Gahagan*, 865 F.2d 1490 (6th Cir. 1989).

Indeed, Elkins directs the court's attention to the fact that DEA Special Agent Morgan signed an affidavit in November of 1996 indicating that the two properties were separate and distinct. Further, Elkins presented evidence that 139 Scott Street had been built in 1969 and 155 Scott Street had been built in 1983.

a privacy interest in the area to be searched voluntarily consents. *Schneckloth v. Bustamonte,* 412 U.S. 218, 219–22, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *United States v. Riascos–Suarez,* 73 F.3d 616, 625 (6th Cir.1996). To be voluntary, consent must be unequivocal, specific, and intelligently given, and must be free from duress or coercion. *Schneckloth,* 412 U.S. at 226, 93 S.Ct. 2041; *United States v. Scott,* 578 F.2d 1186, 1188–89 (6th Cir. 1978), *cert. denied,* 439 U.S. 870, 99 S.Ct. 201, 58 L.Ed.2d 182 (1978).

In the instant matter, the court finds that Elkins had a privacy interest in 139 Scott Street and has standing to contest the search. The issue for the court is whether from the totality of the circumstances Elkins voluntarily consented to the search of 139 Scott Street.

Whether consent is voluntary is measured by considering the totality of the circumstances. *Ohio v. Robinette,* 519 U.S. 33, 39–40, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996); *United States v. Guimond,* 116 F.3d 166, 170 (6th Cir.1997). Thus, determination of voluntariness depends upon the facts in each situation. *See United States v. Scott,* 578 F.2d 1186, 1188–89 (6th Cir.1978), *cert. denied,* 439 U.S. 870, 99 S.Ct. 201, 58 L.Ed.2d 182 (1978). However, the burden of demonstrating voluntariness is upon the government.

■ The United States argues that, under the totality of the circumstances, Elkins should be deemed to have consented to the search of 139 Scott Street. The government presented unrebutted proof that on August 21, 1996, police officers went to the Elkins' home and advised James Elkins that they were investigating a complaint about an indoor marijuana grow at his Scott Street properties. The officers asked Elkins for permission to search and he advised them that "they could look anywhere they wanted to." Elkins then drove them to the Scott Street

property and admitted them. The government argues that Elkins' initial general agreement to a search, Elkins' active cooperation in the search after arrival at the premises, Elkins' knowledge of his right to refuse consent to search, and the absence of coercion, evince that Elkins voluntarily consented.

Concerning the first factor, the initial general agreement to search, the court must weigh this factor in favor of Elkins. The United States cites several examples of testimony by the police officers which relate how they spoke with Elkins at his residence at 1270 Tutwiler prior to going to 139 and 155 Scott Street to obtain his permission to conduct the searches. However, an examination of the cited testimony shows that the police officers were less than certain as to which addresses were discussed in the conversation with Elkins. Indeed, the testimony indicates that specific permission was only given to search 155 Scott Street at that time.[31]

However, the officers testified that after they searched 155 Scott Street, they told Elkins they wanted to search 139 Scott Street. Elkins then attempted to admit them and, ultimately, instructed his wife to open the door and admit the officers. Three of the officers testified that Elkins verbally gave his permission to search 139 Scott Street. Elkins does not directly contest this point, but does argue that there were factors, including the excitement and the demands of the police resulting in fear for his wife's safety, which invalidate his consent. However, he did not press these arguments. Thus, as a *prima facie* matter, it appears that Elkins initially agreed to the search of 139 Scott Street.

Concerning the second factor, Elkins' active cooperation during the search, the testimony of the police officers indicates that he actively cooperated in the search of 139 Scott Street. Elkins apparently at-

---

**31.** Hoing claims that consent was given to search 139 Scott Street while they were at 1270 Tutwiler, but this position is not supported by Elkins' affidavit or testimony or the testimony of the other two officers.

tempted to unlock the door with his keys and he called to his wife inside 139 Scott Street to open the door. She eventually opened the side door to 139 Scott Street and let Elkins and the officers inside. Further, the testimony of the police indicates that Elkins then admitted to the police officers that there was a secret room inside 139 Scott Street and, in order to preserve the integrity of the front portion of the room, showed them where to knock a hole in the wall to gain entry. Elkins did not contest these points in his testimony at the hearing. These facts further support the argument of the United States that Elkins voluntarily gave his consent to search 139 Scott Street. However, it appears that Elkins only admitted to the existence of the secret room and showed the officers where to knock a hole in order to minimize damage to the structure. Elkins' actions occurred after it was apparent that they were going to break through the wall with or without his cooperation. Thus, Elkins' alleged cooperation is not as complete as the United States suggests.

▮ The court acknowledges the affidavit of James Elkins submitted with his *Franks* motion which indicates that his consent was not freely given.[32] The affidavit indicates that Hoing took him by the arm and led him to 139 Scott Street and that the officers were becoming loud and agitated and demanded entry to 139 Scott Street because Carol Elkins' car was now in front of it. Thus, there is some indication of coercion. James Elkins' claimed

that he feared for his wife's safety because of the officers' change in attitude. However, this alleged fear for his wife's safety is not reasonable as it is not supported by any evidence in the record.

The record is devoid of any evidence that Elkins was not aware of his right to refuse consent. Indeed, Elkins' subsequent refusal to consent to a search of 146 Neil Street demonstrates his awareness of his rights.

The totality of the circumstances test is just what it says. The court considers a wide range of factors, not just factors which favor the police or which favor Elkins. In this matter, the credibility of Hoing, as demonstrated by the obvious inconsistencies in his testimony throughout this situation, undermines the position of the government. Notwithstanding this problem, the indisputable facts that Elkins told the officers where to penetrate the wall in order to gain access to the hidden room, and that Elkins gave an initial consent which was never revoked, cause this court to find that Elkins' consent to the search was voluntary. The fact that Elkins' alleged consent was not taped (even though at least parts of the search of 139 Scott Street were taped and · photographed) and the fact that no written "Consent to Search" forms were used do not negate the consent.

Considering all the factors, the court concludes that James Elkins had standing to consent and did voluntarily give his

---

**32.** The United States argues that because James Elkins' affidavit was submitted in support of the motion for a *Franks* hearing and because James Elkins did not testify at the hearing to certain claims made in the affidavit, his claims in his affidavit should not now be considered by the court as he could not be cross-examined on them. The United States presents no authority for this claim.

However, the court notes that Elkins freely took the stand and testified at the hearing. By doing so, he subjected himself to being called by the United States and subjected to direct examination. Thus, the United States' claim is without merit and James Elkins' affidavit will be considered.

It is well-established case law that a defendant who testifies at a preliminary hearing concerning a suppression motion and the Fourth Amendment can do so without fearing having his testimony used against him at the trial on the merits. *Simmons v. United States,* 390 U.S. 377, 390–94, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968); *United States v. Smith,* 783 F.2d 648, 650 (6th Cir.1986). The court sees no reason why the United States could not have called James Elkins as a witness and subjected him to direct examination on preliminary matters concerning *his motion* for suppression under the Fourth Amendment.

consent to search 139 Scott Street. Accordingly, the evidence seized at 139 Scott Street was properly seized pursuant to the consent exception to the warrant requirement and therefore is admissible at trial. The defendants' motions to suppress, therefore, are denied as to the 139 Scott Street search.

*Issue 3—Exigent Circumstances at 2896 Walnut Grove*

▮▮ The third issue raised by the Elkins is whether exigent circumstances existed for the police to enter 2896 Walnut Grove without a warrant. A warrantless search based upon probable cause is permitted when there is some exigency or a compelling urgency for the protection of the police or the public, or to prevent the destruction of contraband or evidence. The Supreme Court has said that warrantless entries and searches are permitted when: 1) the officers reasonably believe that someone is in immediate need of assistance, 2) to protect life or to preserve life, or 3) to avoid serious injury. *Mincey v. Arizona,* 437 U.S. 385, 392–93, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978). However, the Supreme Court has characterized exigent circumstances for the preservation of evidence of a crime as a "now or never" situation. *Roaden v. Kentucky,* 413 U.S. 496, 505, 93 S.Ct. 2796, 37 L.Ed.2d 757 (1973). There is a two prong test to determine if a warrantless entry is justified to prevent the destruction of evidence: 1) the police must have a reasonable belief that third parties are inside the building and 2) the police must have a reasonable belief that loss or destruction of evidence is imminent. *United States v. Bates,* 84 F.3d 790, 796 (6th Cir.1996); *United States v. Radka,* 904 F.2d 357, 362 (6th Cir.1990). *See also United States v. Gaitan–Acevedo,* 148 F.3d 577, 585 (6th Cir.1998). The mere possibility of the loss or destruction of evidence is not sufficient to justify warrantless entry based upon exigency. Further, the fear of destruction of evidence must include the fear that it would be destroyed before a warrant could be obtained. *United States v. Sangineto–Miranda,* 859 F.2d 1501, 1512 (6th Cir.1988). The police bear the burden of demonstrating probable cause that the destruction of evidence was imminent. *Gaitan–Acevedo,* 148 F.3d at 585 n. 4 (citing *United States v. Straughter,* 950 F.2d 1223, 1230 (6th Cir.1991) and *United States v. Padro,* 52 F.3d 120, 122–23 (6th Cir.1995)). The standard is objective and the unreasonable beliefs of the police will not be considered justification for warrantless entry. *Sangineto–Miranda,* 859 F.2d at 1512. Some evidence of the likely imminent destruction of evidence must be presented. *Bates,* 84 F.3d at 796–97; *United States v. Morgan,* 743 F.2d 1158, 1163 (6th Cir.1984).

▮▮ As an initial matter, there is no doubt that the police suspected that criminal activity was occurring inside the building, based upon their earlier observations of marijuana plants through the hole around the PVC pipe and the odor of marijuana emitting from it. However, in this decision, *infra,* the court holds that the police did not have probable cause to initially search the property at 2896 Walnut Grove for evidence of criminal activity. Thus, under the fruit of the poisonous tree doctrine, the police did not have probable cause to believe that evidence was present, let alone that the destruction of evidence was imminent. *See Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). Thus, the Elkins' challenge to the warrantless entry at 2896 Walnut Grove has merit, albeit on a different ground than he presented.

▮▮ However, additionally and in the alternative, assuming, *arguendo,* that the police presence was proper, the court also holds that the police lacked exigent circumstances for their initial entry into 2896 Walnut Grove. This is the argument that Elkins presented in his brief.

The police officers on the scene at 2896 Walnut Grove were waiting for other officers to obtain a warrant to search the premises. While waiting, they observed

two Hispanic men drive up to the building. One of them went inside and the officers detained the one still outside. The one who had gone inside returned outside, observed the detention, and went back inside and closed and locked the door. The United States claims that at that time, exigent circumstances existed for the officers to enter and detain the man still inside in order to prevent the possible destruction of evidence.

The essential question is whether the police had probable cause to believe that the loss or destruction of evidence was imminent. There is no dispute that they have met the first element of the test, that third parties were in the building. However, the second prong of the test, the reasonable belief of the imminent destruction of evidence, is another matter. *United States v. Bates*, 84 F.3d 790, 796 (6th Cir. 1996); *United States v. Radka*, 904 F.2d 357, 362 (6th Cir.1990); *United States v. Gaitan–Acevedo*, 148 F.3d 577, 585 (6th Cir.1998).

Bell admitted in testimony that he had no evidence of any imminent destruction of evidence occurring inside 2896 Walnut Grove after the first man returned inside and locked the door. Some evidence of the imminent destruction of evidence is an essential element to meeting the second prong of the test to establish that the officers had a reasonable belief (*i.e.*, probable cause) to enter the building. *See United States v. Gaitan–Acevedo*, 148 F.3d 577, 585 n. 4 (6th Cir.1998) (holding that the government has the burden of demonstrating probable cause that the destruction of evidence is imminent) (citing *United States v. Straughter*, 950 F.2d 1223, 1230 (6th Cir.1991) and *United States v. Padro*, 52 F.3d 120, 122–23 (6th Cir.1995)).

The time when the police first believed that probable cause as to the destruction of evidence existed is crucial to resolving this issue. The reasonableness of an officer's actions must be judged at the time of the decision and not in hindsight. *United States v. Korman*, 614 F.2d 541, 544 (6th Cir.1980), *cert. denied*, 446 U.S. 952, 100 S.Ct. 2918, 64 L.Ed.2d 808 (1980). Bell testified that he initially detained the first man outside the building because he feared that evidence would be destroyed. Thus, it is to this point in time that the analysis of probable cause must be applied.

Bell admitted that he had no evidence that the destruction of evidence was imminent. Further, there was no evidence which showed that the two men were initially aware of the police nor any evidence that they were aware of the searches of the other buildings, the arrests of the Elkins, or that the police were even aware of any criminal activity inside the building. At that moment, there was no reasonable cause to fear the imminent loss or destruction of evidence in the building and, thus, there was no reason to detain the first man.

It might be argued that at the moment the second man exited the building and saw the detention of the first man, exigent circumstances then existed to conduct the warrantless entry into the building and detain the man who had just gone back inside. However, as previously noted, the initial detention of the first man was not warranted. Thus the police essentially improperly created any possible exigent circumstances caused by the second man's viewing of the seizure of the first man.[33] It is well-established law that the police cannot create exigent circumstances.[34] *United States v. Morgan*, 743 F.2d 1158, 1163 (6th Cir.1984).

---

**33.** Further, there is a question as to whether the man who went inside actually knew the officers were police personnel. Bell was in plain clothes. However, Livingston testified that he was wearing a police shirt.

**34.** The police most likely did not intend to create the exigent circumstances generated by the seizure of the first man which was viewed by the second man. However, the police did improperly detain the first man without probable cause. Thus, the doctrine of creation of exigent circumstances applies.

Even if the man still inside the building had identified the police, there was still no evidence, by the police officer's own admission, indicating that evidence was being destroyed.[35] The police argue that they feared that the man in the building would burn it. However, this is sheer speculation.[36] There is no evidence to support this fear and, in the context of the Fourth Amendment, the police are not allowed to act on speculation. *See Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Indeed, this claim merely detracts from the credibility of the testifying police officers.

The known presence of the police outside, combined with the presence of third parties inside with possible contraband, does not result in the conclusion that the destruction of evidence was imminent. The police have failed to show the requisite "now or never" nature of the situation required to justify warrantless entry to prevent the imminent destruction of evidence. *Roaden v. Kentucky,* 413 U.S. 496, 505, 93 S.Ct. 2796, 37 L.Ed.2d 757 (1973). *See also United States v. Morgan,* 743 F.2d 1158, 1163 (6th Cir.1984) (recognizing that there must be a need for *immediate* police action (emphasis added)) (citing *Warden v. Hayden,* 387 U.S. 294, 298–99, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967)). Thus, the initial warrantless entry of the police into the building to prevent the imminent destruction of evidence was not supported by probable cause and was not reasonable.

For this reason and because probable cause as to the imminent destruction of evidence at the time of the initial stop of the first man outside 2896 Walnut Grove did not exist, the court must hold that the warrantless entry of the police into 2896

Walnut Grove was improper and all evidence gained by it must be suppressed.

*Issue 4—Violation of the Knock and Announce Rule at 146 Neil Street*

■ The fourth issue raised by the Elkins is whether the police violated the knock and announce rule prior to executing the search warrant at 146 Neil Street. The general rule is that the failure of the police to knock and announce their presence prior to executing a search warrant will render any evidence gained during the ensuing execution of that warrant inadmissible. *Wilson v. Arkansas,* 514 U.S. 927, 931–32, 115 S.Ct. 1914, 131 L.Ed.2d 976 (1995); *United States v. Bates,* 84 F.3d 790, 794–95 (6th Cir.1996). There are a number of exceptions to this rule. One of these exceptions applies when the building being searched is a commercial establishment. *United States v. Francis,* 646 F.2d 251, 258–59 (6th Cir.1981). An issue to be considered in the context of the knock and announce rule and commercial establishments is whether the owner was inside the building at the time of search. If he is not present, he will not have standing to dispute a violation of the rule. *Id.*

In this matter, it is undisputed that the Elkins were not present inside 146 Neil Street at the time the search warrant was executed. Further, it is undisputed that 146 Neil Street was not the Elkins' residence and that it is more accurately characterized as a commercial building. Thus, he does not have standing to raise the issue of whether the police complied with the knock and announce rule for the search at 146 Neil Street. Therefore, this claim of the Elkins must be denied.

*Issue 5—Validity of the Affidavits Supporting the Warrants*

■ Finally, based on *Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57

---

**35.** Indeed, given the amount of evidence in a marijuana grow, such as the one that was inside 2896 Walnut Grove, it would have been extremely unlikely that all of it could have been destroyed before a warrant was obtained.

**36.** Moreover, the court notes that by this time, the building was surrounded by police officers and there were even police officers on the roof. No evidence of any smoke or fire was presented by the government.

L.Ed.2d 667 (1978), the Elkins attack the validity of the affidavits by the police officers which supported the issuance of the warrants for the searches. In *Franks*, the Supreme Court held that a defendant may seek suppression of evidence on the basis that the affidavit for a warrant included deliberate falsehoods, or included misinformation or omitted material information with a reckless disregard for the truth. *Id.* There is a two prong test concerning the suppression of evidence based upon false statements in a supporting affidavit: 1) whether the defendant has proven that the affidavit contains deliberately or recklessly false statements and 2) whether the affidavit, without the false statements, still provides the requisite probable cause to uphold the warrant. *United States v. Charles*, 138 F.3d 257, 263 (6th Cir.1998) (citing *Franks v. Delaware*, 438 U.S. 154, 171–72, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978)).

In a *Franks* hearing, the defendant must demonstrate by a preponderance of the evidence that the challenged statements in the affidavit were either intentionally false or made with reckless disregard for the truth. *See United States v. Cummins*, 912 F.2d 98, 101 (6th Cir.1990). Further, the misrepresentations must be shown to be material. *Id.* Finally, the remaining statements in the affidavit should be evaluated under the standard of the totality of the circumstances test. *United States v. Atkin*, 107 F.3d 1213, 1216 (6th Cir.1997) (citing *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)). The *Franks* inquiry should turn on what was in the government's affidavits, not on what the defendant asserts with hindsight and that the government should have known. *United States v. Ozar*, 50 F.3d 1440, 1445–46 (8th Cir.1995).

When facts critical to the existence of probable cause have been omitted from a warrant application, a *Franks* hearing may be required. *Mays v. City of Dayton*, 134 F.3d 809, 815–16 (6th Cir. 1998). However, omissions are not granted the same degree of consideration that material affirmative misrepresentations are given in consideration of a motion to suppress, and usually require some showing of an intent to mislead. *Id.See also United States v. Martin*, 920 F.2d 393, 398 (6th Cir.1990).

### A. *Warrant for 2896 Walnut Grove*

Elkins raises numerous points to contest the warrant issued for 2896 Walnut Grove.[37] Each point will be addressed in turn.

---

37. The verbatim text of the affidavit, in pertinent part, is presented as follows:

Personally appeared before me J.R. HOING, D. CICINELLI, D. GARY and made oath that he/she has good ground and belief, and does believe that JAMES ELKINS is/are in possession of the following described property, to wit: MARIJUANA PLANTS AND GROW EQUIPMENT/DRUG RECORDS contrary to the laws of the State of Tennessee, upon the following described premises, to wit: A BUILDING MORE COMMONLY KNOWN AS 2896 WALNUT GROVE, THE SAME BEING LOCATED IN MEMPHIS, SHELBY COUNTY, TN. and his/her reasons for such belief are that affiant has ON 8/20/96 THE AFFIANTS RECEIVED INFORMATION THAT JAMES ELKINS HAD A POSSIBLE INDOOR MARIJUANA GROW INSIDE 2896 WALNUT GROVE. AFFIANTS WENT TO THE WALNUT GROVE LOCATION AND OBSERVED THE BUILDING TO BE COVERED AROUND THE ROOF AND UTILITY POLES RUNNING UP THE SIDES OF THE BUILDING WITH RAZOR WIRE. THE AFFIANTS WALKED AROUND THE BUILDING AND COULD SMELL THE STRONG ODOR OF RAW MARIJUANA COMING FROM THE BUILDING. AFFIANTS COULD SEE SEVERAL NEW EXHAUST VENTS ALONG THE TOP EDGE OF THE BUILDING AND COULD SEE THE REFLECTION OF WHAT WAS BELIEVED TO BE GROW LIGHTS REFLECTING OFF THE VENT COVERS. AFFIANTS COULD HEAR THE LOUD HUMMING OF BALLASTS COMING FROM INSIDE THE BUILDING. DET. HOING ALONG WITH SERGEANT F. BELL OPERATED A HAND HELD THERMAL IMAGER AND COULD DETECT SEVERAL HEAT SOURCES COMING FROM THE ROOF AREA OF THE BUILDING. BOTH HOING AND BELL ARE CERTIFIED THERMOLOGISTS. BOTH BELL AND HOING HAVE USED THE THERMAL IMAGER ON SEVERAL

Elkins' first point is that the affidavit in question states that on August 20, 1996, the police obtained information that Elkins had a possible indoor marijuana grow at 2896 Walnut Grove. Elkins notes that it appears that the first time 2896 Walnut Grove came to the attention of the police as a possible location involved with Elkins was the night of August 20, 1996, when Martello spoke with Smith, an off-duty police officer, outside Scott Street. However, Bell admitted in testimony at the hearing that he had no information of indoor marijuana grow prior to arriving at 2896 Walnut Grove, when he was brought there by Smith. The evidence shows that Hoing arrived at 2896 Walnut Street after midnight on August 21, 1996, and it was Hoing who signed the affidavit. Thus, Hoing, the signatory of the affidavit, did not have knowledge of the possible grow at 2896 Walnut Grove until August 21, 1996, and not on August 20, 1996, as stated in the affidavit. The government contends this was a minor error of negligence. Standing alone, the error may very well have been minor. However, combined with the questions of credibility raised in this matter and the other problems with the supporting affidavit, the court disagrees with the government's contention.

Elkins' second point is based on the fact that the affidavit uses the term "affiants" and that it is signed by three of the police officers involved: Hoing, Gary, and Cicinelli. Elkins notes that only Hoing, of the three signatories, actually went to 2896 Walnut Grove prior to the making of the affidavit. Elkins argues that this is a significant and material misrepresentation. The government argues that this is an

OCCASIONS AND HAVE RECEIVED POSITIVE READINGS INDICATING HEAT SOURCES THAT RESULTED IN LOCATING INDOOR MARIJUANA GROWS. ON THE EAST SIDE OF THE BUILDING AFFIANTS COULD SEE LIGHT COMING FROM A PVC PIPE WHICH WAS STICKING OUT FROM THE WALL. AFFIANTS LOOKED INTO THE HOLE AND COULD SEE MARIJUANA PLANTS INSIDE THE BUILDING. ON 8/21/96 THE AFFIANTS SPOKE WITH ELKINS AND RECEIVED CONSENT TO SEARCH 139 AND 155 SCOTT ST. WHICH WAS SUSPECTED OF HOUSING A INDOOR MARIJUANA GROW. ELKINS ALLOWED AFFIANTS INSIDE 139 SCOTT ST. AND OFFICERS FOUND APPROX. (2) POUNDS OF HARVESTED MARIJUANA BUDS. THERE WAS ALSO ASSORTED GROWING CHEMICALS AND ASSORTED MARIJUANA GROW EQUIPMENT. OFFICERS FOUND TWO SETS OF DIGITAL SCALES AND DRUG NOTES. OFFICERS INQUIRED TO MR. ELKINS ABOUT A POSSIBLE VOID AREA IN BETWEEN 139 AND 155 SCOTT AND HE ADVISED OFFICERS WOULD HAVE TO KNOCK A HOLE IN THE WALL TO ENTER THE HIDDEN ROOM. OFFICES GAINED ENTRY BY KNOCKING A HOLE IN THE WALL AND LOCATED A LARGE INDOOR GROW ROOM CONSISTING OF (31) LIGHTS, DOZENS OF PLANTER POTS, DOZENS OF FANS, TIMERS, BALLASTS AND A WATER SYSTEM. THE ROOM HAD A DOOR FROM THE INSIDE BUT WAS COVERED WITH DRY WALL FROM THE OUTSIDE HIDING ITS LOCATION. MR. ELKINS WAS ADVISED THAT OFFICERS KNEW OF THE WALNUT GROVE LOCATION AND HE ADVISED OFFICERS WOULD HAVE TO GET A WARRANT BECAUSE HE NEEDED HIS ATTORNEY. ON 8/21/96 AFFIANTS WERE SECURING A SEARCH WARRANT WHEN VEH. PULLED UP TO 2896 WALNUT GROVE OCCUPIED BY TWO MALE HISPANIC. THE PASSENGER RAN INSIDE THE BUSINESS AND LOCKED THE DOOR BEHIND HIM. THE DRIVER WAS DETAINED BY SGT. BELL. AFFIANTS CONTACTED ASSISTANT ATTORNEY GENERAL JERRY HARRIS, WHO ADVISED DUE TO EXIGENT CIRCUMSTANCES OFFICERS SHOULD ENTER THE BUSINESS AND SECURE THE OCCUPANTS. SERGEANT F. BELL AND OTHER OFFICERS ENTERED THE BUSINESS AND SECURED A TOTAL OF SEVEN (7) MALE HISPANICS. SERGEANT F. BELL THEN IMMEDIATELY EXITED THE BUSINESS AND ADVISED THAT HE SAW NUMEROUS MARIJUANA PLANTS. THIS OCCURRED IN MEMPHIS, SHELBY COUNTY, TENNESSEE. He/She therefore asks that a warrant issue to search the person and premises of the said JAMES ELKINS as above described in said County, where he/she believes said MARIJUANA PLANTS AND GROW EQUIPMENT/DRUG RECORDS is/are now possessed, contrary to the Laws of Tennessee.
R.D. GARY J.R.HOING D.CICINELLI
(signatures)
Sworn to and subscribed before me, this 21ST day of AUGUST 1996

inadvertent and immaterial error. Again, standing alone, this problem with the affidavit might be immaterial. However, the court notes that two of the officers who signed the affidavit admitted in testimony that they had no personal knowledge of many of the facts therein. If they had signed the affidavit alone, such an act could be grounds for a charge of perjury. Taken in conjunction with the other questions raised about the affidavit, under the totality of the circumstances, the court finds that the point is material.

Elkins' third point is that the statement in the affidavit that razor wire was around the roof of the building and on the utility poles was incorrect. In fact, the razor wire only covered part of the roof and there was no razor wire on the utility poles, although there was razor wire on a pipe on the side of the building. Indeed, one of the officers testified that there was no razor wire on the "utility pole" and Hoing admitted that it appeared to be a "pipe" and not a "pole." This is not a material point.

 Elkins' fourth point of contention concerns the statement in the affidavit that the affiants walked around the building and smelled the strong odor of marijuana coming from the building. Elkins, again, notes that of the signatories to the affidavit, only Hoing actually went to the building before the issuance of the warrant. Elkins also notes that both Bell and Hoing admitted in testimony at the hearing that they did not smell the marijuana until they bent down near the PVC pipe extending from the east wall of 2896 Walnut Grove. Elkins also presents the significant fact that three off-duty police officers and two private security guards who had been em-

ployed by Elkins during 1996 to provide security and surveil his buildings, including 2896 Walnut Grove, never smelled the odor of marijuana while working there, although the police officers indicated that they had not walked along the east side of the building where the pipe in question was located. Elkins also raises the point that there was a working HVAC system, which would, as acknowledged by the experts of both parties, dilute and dissipate any odors present.

Both parties presented expert witnesses. The expert for the government, Charles Stowall ("Stowall"), testified that the odor of raw marijuana is strong and pungent and detectable over long distances (up to 150 feet away) and that it will be concentrated when in a confined and heated space such as an indoor marijuana grow, like the one at 2896 Walnut Grove. The expert for Elkins, Dr. Mark Driver ("Driver"), testified that any odor of marijuana would have dissipated approximately 50 feet above the ground after being expelled from the vents on the roof.[38]

Elkins' challenge to the validity of the statement in the affidavit that the officers smelled a strong odor of raw marijuana coming from the building does not address a direct material misrepresentation, but it does show that the statement was less than accurate. The affidavit clearly and strongly implies that the odor of marijuana was all about the external part of the building when this, in fact, was not the case.[39] Yet, the United States, in its post-hearing brief, focuses on the testimony that the officers smelled the marijuana near the PVC pipe. The evidence in the record shows that the officers only smelled the odor of marijuana emanating from the

---

**38.** The United States raises some valid criticisms of Elkins' expert. However, his testimony was helpful as to certain issues of fact and will not be entirely discounted.

**39.** The United States relies heavily on its expert witness' testimony that the odor of marijuana could be detected as far away as distances of 150 feet. However, the direct testimony of Bell and Hoing at the hearing indicates that the marijuana odor could not be detected except when the officers bent over near the PVC pipe. Further, the fact that the off-duty police officers and the security guards never smelled the marijuana severely undermines the government's position.

PVC pipe when they were very close to it. The court finds that this is a material point as to the establishment of probable cause and that it is a reckless disregard for the truth.

Elkins' fifth point concerning the affidavit presented in support of the application for a search warrant at 2896 Walnut Grove is the use of the word "new" concerning the HVAC ducts on top of the building. There was apparently no evidence to indicate that they were new, except that they were shiny. However, the court finds that the officer's inference of newness based on color to be reasonable. At the hearing, Hoing conceded that the word could have been deleted from the affidavit. This point is not material to the issue of whether a marijuana grow was located inside 2896 Walnut Grove.

■ The sixth point challenges the statement that the affiants could see the reflection of what they believed to be light from "grow lights" reflecting off the covers of the ducts. Elkins notes that the evidence presented at the hearing indicated that the external area around the building was well lit with high pressure sodium lights. This is supported by the testimony of some of the officers, though Hoing could not recall whether the exterior of the building was lit at the time he made his observations. Further, and more significantly, Elkins argues that there was no evidence presented to support the claim that the light observed reflecting from the ducts was due to "grow" lights, at least at the time of the affidavit, and that the bright light could be indicative of any number of other commercial applications.[40]

This point is material in that there appears to be no evidence that the reflected light was due to "grow" lights. Driver testified that bright lights have other commercial applications and explanations besides growing marijuana. Accordingly, the portion of the statement that refers to the reflected light as attributed to grow lights will not be considered in the final analysis of whether probable cause existed.

Elkins, for his seventh point, argues that the statement in the affidavit about the sound of the ballasts was inappropriately mentioned because the affidavit did not mention a number of other nearby sources of similar noise: 1) the external sodium lights near the building had ballasts, 2) nearby high-tension wires created a humming, 3) an MGL & W power substation across the street made a certain degree of noise, and 4) the 15 air conditioning units operating on the roof of the building made noise. The government argues that Driver did not visit the site until 1999, well after the time of the observations made by the police and thus his observations with regard to the ambient noise are not credible. Further, Bell testified that he could hear the electric humming from the power sub-station across the street and that he could distinguish that sound from the sound of the ballasts humming inside the building through the PVC pipe. Elkins does not present sufficient evidence which would show that Bell's statements should not be granted due weight. Thus, this challenge raised by Elkins does not have merit.

■ For his eighth point contesting the validity of the affidavit, Elkins argues that the statement that Hoing and Bell could detect several heat sources coming from the roof was suspect. In support he argues that there were difficulties with the thermal imager. Livingston testified that the battery was running low. Further, Livingston indicated that other mundane sources, such as air conditioners or hot water heaters, could account for a positive reading on the thermal imager.[41]

---

**40.** Elkins also challenges the failure to mention the external lights in the affidavit as a significant omission. However, the point is immaterial as Bell testified that the external

light was lit and he was still able to distinguish the two light sources.

**41.** The fact that Livingston made a tape recording of the imaging, gave it to Bell, and it

Regardless, as the court has previously discussed, the use of a thermal imager constitutes a search under the Fourth Amendment, requiring a warrant when a reasonable expectation of privacy is involved. In this matter, as previously held, Elkins had a reasonable expectation of privacy concerning the activities inside the building at 2896 Walnut Grove and in the heat signature emanating from the building. *See Dow Chemical Company v. United States,* 476 U.S. 227, 236, 106 S.Ct. 1819, 90 L.Ed.2d 226 (1986); *United States v. Cusumano,* 67 F.3d 1497 (10th Cir. 1995), *vacated on other grounds,* 83 F.3d 1247 (10th Cir.1996) (*en banc*). As the use of the thermal imager revealed information about the activity within the building, the warrantless use of the thermal imager was improper. Accordingly, the statement in the affidavit referring to the observation of positive heat sources shall be stricken from consideration of the existence of probable cause for the issuance of the warrant.

Elkins next challenges the statement that Hoing and Bell are certified thermologists. Hoing admitted at the hearing that he was not so certified.[42] This is a material misrepresentation. The fact that the proper term is thermographer and not thermologist is immaterial. However, this objection is not relevant because of the court's holding as to the admissibility of the use of the thermal imager.

■ Elkins also challenges the statement in the affidavit that the officers observed light emitting from around the PVC pipe on the east side of the building at 2896 Walnut Grove. In support, Elkins refers to the testimony of the officers which shows that the observed light was actually coming from the gap surrounding the PVC pipe. Testimony at the hearing clearly showed that the PVC pipe was

actually an overflow drain for the hot water heater and that it was impossible for any light to come from it.

Interestingly, this point is not addressed by the United States in its post-hearing brief. It appears to be a significant and material point which cannot be attributed to mere poor draftsmanship. Elkins argues that he had previously sealed any gap around the PVC pipe and offers in support the testimony of his private investigator, which the government disputes. However, the fact remains that the government simply fails to address this discrepancy between the affidavit and the testimony of the police officers. This statement appears to have been made with reckless disregard for the truth. Thus, this statement will not be considered by this court in determining whether the warrant was supported by probable cause.

■ Next, Elkins challenges the statement in the affidavit that the affiants looked into the hole and could see marijuana plants inside. Elkins raises the issue of the angle of looking through a cinder block wall and the fact that the marijuana plants inside the building were on platforms and held up by tomato cages. On its face, this challenge has some merit, but not enough to warrant striking the statement from consideration by the court.

What appears to be more important, although not raised by Elkins, is the question of whether the police were initially justified in approaching the pipe and looking through the hole or the gap around the PVC pipe. As previously stated, Elkins has a reasonable expectation of privacy in the interior of his commercial buildings. *See Dow Chemical Company v. United States,* 476 U.S. 227, 236, 106 S.Ct. 1819, 90 L.Ed.2d 226 (1986). However, the Supreme Court has recognized that this reasonable expectation of privacy is less in

---

has not been produced or given to the defense makes the consideration of the heat gradient detected through the imager suspect. *State v. Siegal,* 281 Mont. 250, 934 P.2d 176, 192–93 (1997).

**42.** The court recognizes that Hoing did attend a class on thermal imaging and received a certificate of attendance.

certain circumstances than that accorded to private residences, such as where the commercial activity is a "closely regulated" industry, such as liquor dealers. *New York v. Burger*, 482 U.S. 691, 699–700, 107 S.Ct. 2636, 96 L.Ed.2d 601 (1987); *McLaughlin v. Kings Island, Division of Taft Broadcasting Co.*, 849 F.2d 990, 993–94 (6th Cir.1988). As the police did not determine what commercial activity was occurring (or purported to be occurring) at 2896 Walnut Grove and as the police did not investigate the building as a known regulated industry, this exception does not apply.

It must be noted that the officers had no information about the Walnut Grove address until the gratuitous disclosure by Smith. Smith advised the officers that he was guarding a building on Walnut Grove owned by Elkins, and volunteered to admit the officers to the building. While they declined admission, the officers did allow Smith to lead them to the building and specifically identify it. At this time, the officers had no probable cause to believe that there was criminal activity at 2896 Walnut Grove. Any suspicion they had was based solely on the "naked statement of Smith" that Elkins owned Walnut Grove. Based solely on this information, the officers entered upon the environ of the property, disregarding a no trespassing sign, conducted a thermal image of the entire exterior, directed a helicopter FLIR (*i.e.*, aerial thermal imager) image of the roof, peeked through a hole in the wall, leaned down to sniff a PVC pipe to detect an odor of marijuana, and inclined their ears to monitor the humming ballasts of high-powered sodium lights emanating from the interior of the building.

Once Bell detected the positive heat signature with the thermal imager, observed the light reflecting off the vents or ducts on the roof, and observed the light from the PVC pipe, he intended to violate the Elkins' reasonable expectation of privacy by looking through the hole in the pipe or the gap around it and sniffing for the odor of marijuana. What must be determined at this point is whether Bell not only had probable cause to do so, but whether exigent circumstances existed to proceed without a warrant. As previously discussed, the use of the thermal imager was improper. So, all that remains are the facts that Bell observed light reflected from the vents or ducts on the roof, observed light emitting from or around the PVC pipe in the wall, and he knew that Elkins was under investigation for a possible drug law violation at another location.

It must be kept in mind that Bell testified that he had no idea if Elkins was engaged in any drug law violations at 2896 Walnut Grove prior to his conversation with Smith. Moreover, Smith did not present any evidence of any suspicious behavior at any of the addresses under investigation, including 2896 Walnut Grove. Given these facts, the court must conclude that at the time Bell approached the PVC pipe, he did not have sufficient probable cause and exigent circumstances to violate Elkins' reasonable expectation of privacy. *See Dow Chemical Company v. United States*, 476 U.S. 227, 236, 106 S.Ct. 1819, 90 L.Ed.2d 226 (1986). Thus, any evidence gathered as a result of the officers looking through the pipe or the gap around it must be suppressed.

Elkins also challenges the statement that he gave his consent to search 139 and 155 Scott Street. Elkins does not contest that he gave his consent to search 155 Scott Street and, as previously held, Elkins did voluntarily give his consent to search 139 Scott Street. Thus, this challenge is immaterial.

■ Further, Elkins challenges the statement in the affidavit that an indoor marijuana grow was suspected to exist at 139 and 155 Scott Street. Elkins accurately states that the tip of the original informer (*i.e.*, the speeder) did not include 139 Scott Street. As the two addresses were separate, this point is material and the part of the statement referring to 139 Scott Street will not be considered in the

final analysis of the existence of probable cause.

Elkins also contests the statement that he allowed the affiants inside 139 Scott Street. The court has previously held that he voluntarily allowed the police into 139 Scott Street. Thus, this challenge is without merit

Elkins challenges the statement that the officers found two pounds of marijuana at 139 Scott Street. This statement cannot be materially faulted for its accuracy regarding the fact that marijuana was found at 139 Scott Street and the dispute as to the amount is immaterial. Further, given that the entire search of 139 Scott Street was done with Elkins' voluntary consent, all references in the affidavit to marijuana and paraphernalia seized at 139 Scott Street will be considered by the court.

Elkins also objects to the statement that the passenger ran inside 2896 Walnut Grove and locked the door behind him. Although there is conflicting testimony as to whether the man ran back in or walked back, this objection is immaterial, as his pace is irrelevant.

■ Elkins also challenges the statement that exigent circumstances existed for the warrantless entry into 2896 Walnut Grove. As previously discussed, exigent circumstances did not exist for the warrantless entry. Moreover, this statement is conclusory. Indeed, the affidavit does not even state the reason given by the officers for the warrantless search: fear of the imminent loss or destruction of evidence. Thus, the court concludes this point is material and should be excluded from consideration. *See United States v. Bates,* 84 F.3d 790, 796 (6th Cir.1996); *United States v. Radka,* 904 F.2d 357, 362 (6th Cir.1990); *United States v. Gaitan–Acevedo,* 148 F.3d 577, 585 (6th Cir.1998).

■ Elkins challenges the statement that seven Hispanic males were secured from 2896 Walnut Grove and that Bell immediately exited the building. Elkins claims the statement in the affidavit was not numerically accurate. The original man who went inside and the five other Hispanics who were already inside were also seized—amounting to six men seized from inside the building. However, the statement could be interpreted to include the man who was initially detained outside the building at 2896 Walnut Grove. Thus, this objection is not material. Further, the claim that Bell did not immediately exit the building is without merit, as he apparently did exit it but then went back in to find the remaining two occupants who were hiding inside. However, as the initial seizure of the first Hispanic who initially arrived at 2896 Walnut Grove was not supported by probable cause, the subsequent seizures of the remaining men were not justified. Thus, the reference in the warrant to their seizure should also be stricken. *See Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963) (discussing the fruit of the poisonous tree doctrine).

■ Finally, Elkins challenges the statement that Bell advised that he saw numerous marijuana plants inside the building. As Bell's entry into the building was not supported by exigent circumstances, any observations he made while present inside should not be considered.

■ Thus, the following facts in the affidavit remain to be considered: 1) razor wire was around part of the roof and on a pipe attached to the side of the building, 2) new ducts or vents were on the roof of 2896 Walnut Grove, 3) bright light was seen reflecting from the vents or ducts on the roof, 4) the sound of ballasts were heard coming from the building, 5) the police found approximately two pounds of marijuana and associated growing equipment at 139 Scott Street, 6) the police suspected that an indoor marijuana grow existed at 155 Scott Street, and 7) Elkins voluntarily permitted the police to search 139 Scott Street. A brief examination of these remaining facts in the affidavit sup-

porting the warrant show no link between Elkins and 2896 Walnut Grove.

Under the *Franks* totality of circumstances test, the court can only conclude that, after the improper statements have been removed from consideration, there was insufficient probable cause existing in the affidavit to support the issuance of the warrant for 2896 Walnut Grove. *United States v. Atkin*, 107 F.3d 1213, 1216 (6th Cir.1997) (citing *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)). Accordingly, the warrant for 2896 Walnut grove is not valid.

### B. Warrant for 1270 Tutwiler Issued August 21, 1996

This affidavit is, factually, quite brief.[43] It was primarily prepared by Hoing and signed by Hoing, Gary, and Cicinelli and states essentially the following five facts: 1) the officers spoke with Elkins concerning a marijuana grow at 139 Scott Street, 2) Elkins invited the officers into his house at 1270 Tutwiler, 3) the officers smelled the strong odor of marijuana, 4) the affiants have handled scores of marijuana cases and recognize the odor of marijuana, 5) Cicinelli spoke with a "confidential informant" who advised that Elkins was grow-

ing marijuana at 1270 Tutwiler and his adjacent property.

Elkins first contests the statement that the officers spoke with him about 139 Scott Street. As previously discussed, it is apparent that 155 Scott Street was discussed with James Elkins. It is not entirely clear that the officers specifically mentioned 139 Scott Street. Although it can be argued that, given the fact that the two addresses are connected, this is an immaterial misrepresentation, it must be considered in the context of the entire affidavit.

Elkins also contests the statement that Cicinelli spoke with a confidential informant who stated that Elkins was growing marijuana at his residence at 1270 Tutwiler. As the evidence shows, it was not a confidential informant Cicinelli spoke with, but rather it was an anonymous caller. Indeed, Cicinelli admitted that the caller was unreliable. This is not an immaterial misrepresentation. The difference between a confidential informant and an anonymous caller is significant and cannot be ignored. There is little doubt that the judge issuing the warrant relied upon this representation.

Finally, Elkins contests the statement that the officers smelled a strong odor of

---

**43.** The verbatim text of the affidavit, in pertinent part, is presented as follows:

Personally appeared before me J.R. HOING, D. CICINELLI, D. GARY and made oath that he/she has good ground and belief, and does believe that JAMES ELKINS is/are in possession of the following described property, to wit: MARIJUANA PLANTS/GROW EQUIPMENT/DRUG RECORDS contrary to the laws of the State of Tennessee, upon the following described premises, to wit: A TWO STORY HOUSE MORE COMMONLY KNOWN AS 1270 TUTWILER, ALL VEHICLES AND OUTBUILDINGS LOCATED ON SAID PREMISES. THE SAME BEING LOCATED IN MEMPHIS, SHELBY COUNTY, TENNESSEE, and his/her reasons for such belief are that affiant has @SPOKE WITH MR. ELKINS ON 8/21/96 AT HIS HOME LOCATED AT 1270 TUTWILER ABOUT A COMPLAINT OF HIM GROWING MARIJUANA AT A BUILDING HE OWNS LOCATED AT 139 SCOTT ST. MR. ELKINS INVITED THE AFFIANTS INSIDE HIS HOUSE AND OFFI-CERS COULD SMELL THE STRONG SMELL OF MARIJUANA IN THE HOUSE. THE AFFIANTS HAVE HANDLED SCORES OF CASES INVOLVING MARIJUANA AND ARE FAMILIAR WITH THE ODOR. DET. CICINELLI HAS SPOKE WITH A C/I WHO ADVISED THAT ELKINS GROWS MARIJUANA AND PROCESSES IT IN HIS HOME AT 1270 TUTWILER AND IN THE WEST SIDE ADJACENT HOUSE LOCATED ON THE SAME LOT. ALL THE ABOVE OCCURRED IN MEMPHIS, SHELBY COUNTY, TN. He/She therefore asks that a warrant issue to search the person and premises of the said JAMES ELKINS as above described in said County, where he/she believes said MARIJUANA PLANTS/GROW EQUIPMENT/DRUG RECORDS is/are now possessed, contrary to the Laws of Tennessee. R.D. GARY J.R.HOING D.CICINELLI (signatures) Sworn to and subscribed before me, this 21ST day of AUGUST 1996

marijuana when they entered 1270 Tutwiler. Although Elkins does not directly contest this point, he does raise a valid question as to the officers' subsequent behavior, which bears on the credibility of their statements that they smelled marijuana. This question is why officers left Carol Elkins, an obvious suspect, alone at 1270 Tutwiler without detailing an officer to secure the house.[44]

The United States argues that the smell of marijuana alone "*could* supply probable cause to believe that marijuana was inside the building." (emphasis added). In support the government cites *United States v. Garza*, 10 F.3d 1241, 1246 (6th Cir.1993) and *United States v. Caves*, 890 F.2d 87, 89 (8th Cir.1989). The court agrees that the smell of marijuana alone *could* be sufficient to supply the probable cause for the issuance of the warrant.

In this matter, it is apparent that the statement in the affidavit characterizing the anonymous caller as a confidential informant was, at the least, recklessly false. In light of the totality of the facts in this case, the court finds that it constitutes a material misrepresentation. Thus, this statement will be not be considered in deciding whether probable cause existed for the issuance of the warrant.

■ The totality of the circumstances should be examined when considering a motion to suppress and whether probable cause exists. *United States v. Atkin*, 107 F.3d 1213, 1216 (6th Cir.1997) (citing *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)). The behavior of

the officers in failing to secure the premises and leaving a suspect on the scene,[45] the material misrepresentation as to the status of the anonymous caller being a confidential informant, the arguably immaterial misrepresentation as to the address discussed to be searched on Scott Street, the delay in seeking a warrant until the late afternoon, and the extremely brief recitation of supporting facts in the affidavit lead this court to conclude that the affidavit supporting the application for the warrant issued on August 21, 1996, was insufficient. Accordingly, this warrant is also invalid.

### C. Warrant for 146 Neil Street

■ The affidavit supporting the application for a search warrant for 146 Neil Street contains the following essential facts: 1) an investigation was being conducted on a complaint of an indoor marijuana grow at 139 Scott Street and 146 Neil Street, 2) James Elkins owned the buildings at 139 Scott Street and 146 Neil Street, 3) Hoing and Bell operated a thermal imager on August 20, 1996, and obtained positive heat readings from 146 Neil Street, 4) Hoing and Bell are certified thermologists and have used the imager where other indoor marijuana grows were located, 5) 146 Neal Street is located behind 139 Scott Street, 6) a large indoor marijuana grow room and two pounds of marijuana were discovered at 139 Scott Street on August 21, 1996, 7) Elkins verbally gave his consent to the search at 139 Scott Street, 8) Hoing checked the MLG &

---

**44.** In its post-hearing brief, the United States argues that the testimony of the officers as to the presence of the strong smell of marijuana at 1270 Tutwiler is supported by the subsequent discovery of dried marijuana and the growing equipment. However, Stowall indicated that it is the live marijuana and its associated oils, etc., which would generate a strong odor. The dried marijuana discovered in the Elkins' attic would not have generated such a strong smell. Moreover, this justification for the probable cause of a strong smell of marijuana occurred after the fact and should not be considered.

**45.** Judicial authority has, at least implicitly, recognized that it is proper procedure to secure a residence when waiting to obtain a warrant for that residence. *See, e.g., United States v. Walker*, 706 F.2d 28, 29 (1st Cir. 1983).

Further, in contrast, the court notes that the police used the reason of securing the premises and preventing the destruction of evidence for their initial seizure of the Hispanic males at 2896 Walnut Grove.

W utility records and discovered that the accounts for 139 and 155 Scott Street and 146 Neil Street were listed in the name of Ricas Properties, 9) Elkins initially gave his consent to search 146 Neil Street and then withdrew it, 10) Elkins gave the key to 146 Neil Street to the police, 11) Cicinelli received information from a confidential informant that Elkins was growing marijuana in the building to the rear of 139 Scott Street which was 146 Neil Street, and 12) an officer observed a pallet of bags of sheep manure behind 146 Neil Street, which the officers knew, based on previous experience, was used in the growing of marijuana.[46]

Elkins first contests the statement that James Elkins owned 139 Scott Street and 146 Neil Street. James Elkins refers to a stipulation in the record that reflects the fact that Renaissance Investments owns 146 Neil Street and Ricas Properties owns 139 Scott Street, and that Carol Elkins is the registered agent, president, and sole shareholder of both firms. This would appear to be a material misrepresentation of fact. However, off-duty police officers were employed by James Elkins to protect the properties in question. Further, it was James Elkins who refused his consent to search 146 Neal Street, had a key to 146 Neal Street, and involved in the dispute as to the giving of consent to search 139 Scott Street. Despite the stipulation in the record that Carol Elkins was the sole shareholder, the actions and statements of James Elkins clearly indicated ownership. Thus, the reliance of the police upon his actions and statements was not unreasonable. Thus, Elkins' objection is rejected.

Elkins next contests the statement that Hoing and Bell received a positive heat source from the building. The basis for Elkins' dispute is the omission from the

---

**46.** The verbatim text of the affidavit, in pertinent part, is presented as follows:

Personally appeared before me J.R. HOING, D. CICINELLI, D. GARY and made oath that he/she has good ground and belief, and does believe that JAMES ELKINS is/are in possession of the following described property, to wit: MARIJUANA PLANTS AND GROW EQUIPMENT/DRUG RECORDS contrary to the laws of the State of Tennessee, upon the following described premises, to wit: A BUILDING MORE COMMONLY KNOWN AS 146 NEIL. THE SAME BEING LOCATED IN MEMPHIS, SHELBY COUNTY, TN. and his/her reasons for such belief are that affiant HAS ON 8/20/96 INVESTIGATED AN INDOOR MARIJUANA GROW COMPLAINT AT 139 SCOTT ST. AND 146 NEIL ST. WHICH ARE BOTH BUILDINGS OWNED BY JAMES ELKINS. ON 8/20/96 HOING AND DET. F. BELL OPERATED THE HAND HELD THERMAL IMAGER AND RECEIVED A POSITIVE HEAT SOURCE FROM THE REAR AND SIDE OF THE BUILDING. HOING AND BELL ARE CERTIFIED THERMOLOGISTS AND HAVE USED THE IMAGER ON SEVERAL OCCASIONS WHERE INDOOR MARIJUANA GROWS HAVE BEEN LOCATED. THIS BUILDING IS BEHIND 139 SCOTT ST. WHERE OFFICERS LOCATED A LARGE INDOOR MARIJUANA GROW ROOM ALONG WITH APPROX. (2) POUNDS OF MARIJUANA ON 8/21/96. ELKINS GAVE OFFICERS VERBAL CONSENT TO SEARCH 139 SCOTT ON 8/21/96. HOING HAS CHECKED THE MLG & W COMPUTER AND LEARNED THAT 146 NEIL ST. IS UNDER THE NAME OF RICAS PROPERTIES WHICH IS THE SAME NAME ON THE ACCOUNT OF 139 AND 155 SCOTT ST. ON 8/21/96 ELKINS WAS ASKED FOR CONSENT TO SEARCH 146 NEIL AND HAD AGREED BUT THEN DECIDED NOT TO GIVE CONSENT ADVISING THAT WOULD ONLY MAKE THINGS HARDER FOR HIMSELF. ELKINS DID GIVE HOING THE KEY TO 146 NEIL ST. AND ADVISED FOR HIM TO DO WHAT HE HAD TO DO. DET. CICINELLI RECEIVED INFORMATION FROM A C/I THAT ELKINS IS GROWING MARIJUANA IN THE ADJACENT BUILDING IN THE REAR OF 139 SCOTT WHICH IS 146 NEIL. ON 8/20/96 OFFICERS OBSERVED A PALLET OF BAGS OF SHEEP MANURE STACKED BEHIND 146 NEIL AND NEXT TO 139 SCOTT ST. WHICH IS USED IN THE GROWING OF MARIJUANA. ALL THE ABOVE OCCURRED IN MEMPHIS, SHELBY COUNTY, TN.

He/She therefore asks that a warrant issue to search the person and premises of the said JAMES ELKINS as above described in said County, where he/she believes said MARIJUANA PLANTS/GROW EQUIPMENT/DRUG RECORDS is/are now possessed, contrary to the Laws of Tennessee.

R.D. GARY J.R.HOING D.CICINELLI
(signatures)
Sworn to and subscribed before me, this 21ST day of AUGUST 1996

affidavit that obtaining a clear line of sight to 146 Neil Street was apparently difficult to obtain. This omission is not material. However, as previously discussed, the use of the thermal imager constitutes a search within the meaning of the Fourth Amendment. Even though the building is commercial in nature, Elkins had a reasonable expectation of privacy concerning 146 Neal Street. *See Dow Chemical Company v. United States,* 476 U.S. 227, 236, 106 S.Ct. 1819, 90 L.Ed.2d 226 (1986). Thus, for this warrant application, the statement concerning the detection of heat from the use of the thermal imager will not be considered when determining whether probable cause existed to support the warrant.

Elkins also contests the statement that Hoing and Bell are certified thermologists. Hoing admitted that at the hearing that he was not so certified which raises questions as to the accuracy of Hoing's other statements in the affidavit. This is a material misrepresentation.

Elkins next contests the statement that 146 Neil Street is behind 139 Scott Street. In actuality, 146 Neal Street is at an angle to the rear of 139 Scott Street. This is an immaterial misrepresentation.

Elkins also contests the statement that the police located a large indoor marijuana grow and two pounds of marijuana at 139 Scott Street on August 21, 1996. The bases for Elkins' claim are that the police testimony concerning the amount of marijuana seized at 139 Scott Street is inconsistent and that the police had no authority to enter 139 Scott Street. The argument concerning the discrepancies in the testimony concerning the amount of marijuana that was seized are immaterial. Further, as previously discussed, Elkins did voluntarily give his consent to the search. Thus, this objection is without merit.

Next, Elkins contests the statement that he gave verbal consent to the search of 139 Scott Street. On its face, this statement is not obviously false. Further, the court previously held that Elkins did voluntarily give his consent to the search of 139 Scott Street. Thus, because the statement is not false, it will not be stricken from consideration of whether probable cause existed for the issuance of the warrant for 146 Neal Street.

Additionally, Elkins contests the statement that Cicinelli received information from a confidential informant that Elkins was growing marijuana in the adjacent building in the rear of 139 Scott Street, which is 146 Neal Street. As previously held, this characterization of the anonymous caller as a confidential informant is a material misrepresentation. If it was not knowingly false, it was, at the very least, stated with reckless disregard for the truth.

This process leaves the court with the following allegations of fact in the affidavit supporting the issuance of the warrant for 146 Neil Street: 1) an investigation was being conducted into a complaint of an indoor marijuana grow at 139 Scott Street and 146 Neil Street; 2) James Elkins owned the buildings at 139 Scott Street and 146 Neil Street; 3) 146 Neal Street is located behind 139 Scott Street; 4) two pounds of marijuana and associated growing equipment was found at 139 Scott Street; 5) Elkins voluntarily gave his consent to a search of 139 Scott Street; 6) Elkins initially gave his consent for the police to search 146 Neil Street and then withdrew it; and 7) the officers observed a pallet of sheep manure fertilizer, which is commonly used to grow marijuana, outside 146 Neil Street. Given these facts, the court concludes that the warrant for the search of 146 Neil Street was supported by sufficient probable cause in the affidavit. *United States v. Atkin,* 107 F.3d 1213, 1216 (6th Cir.1997) (citing *Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)).

*D. Warrant for 1270 Tutwiler Issued August 22, 1996*

█ Elkins objects to a number of the statements in the affidavit signed by Oliver

and Tate which was presented in support of the application for the search warrant at 1270 Tutwiler on August 22, 1996. Each will be addressed, *seriatim.*

First, Elkins objects to the statements that: 1) he consented to the search of 139 Scott Street; 2) during the search of 139 Scott Street 1.53 pounds of marijuana was found; and 3) the search of 139 Scott Street yielded a completely equipped indoor marijuana grow.[47] As previously discussed, these objections are rejected.

47. The verbatim text of the affidavit, in pertinent part, is presented as follows:

Personally appeared before me D. TATE & R. OLIVER and made oath that he/she has good ground and belief, and does believe that A MALE WHITE MALE, JAMES ELKINS AND A FEMALE WHITE, CAROL ELKINS is/are in possession of the following described property, to wit: MARIJUANA AND RECORDS PERTAINING TO MARIJUANA contrary to the laws of the State of Tennessee, upon the following described premises, to wit: A SINGLE FAMILY DWELLING MORE COMMONLY KNOWN AS 1270 TUTWILER WHICH IS LOCATED IN MEMPHIS, SHELBY COUNTY, TENNESSEE. THIS SEARCH TO INCLUDE ALL OUTBUILDINGS AND VEHICLES ON THE PREMISES. and his/her reasons for such belief are that affiant has ON WEDNESDAY, AUGUST 21, 1996, MEMPHIS POLICE OFFICERS RECEIVED A CONSENT TO SEARCH FOR A BUSINESS OWNED AND OPERATED BY JAMES AND CAROL ELKINS AT 155 AND 139 SCOTT WHICH ARE UNDER THE SAME ROOF. A SIGN IN FRONT OF 155 AND 139 SCOTT BEARS ONE BUSINESS NAME OF RENAISSANCE INVESTMENTS. DURING THE SEARCH OF 139 SCOTT, OFFICERS FOUND 1.53 POUNDS OF MARIJUANA. JAMES AND CAROL ELKINS WERE ARRESTED FOR POSSESSION OF A CONTROLLED SUBSTANCE WITH INTENT TO MAN/ DEL/SELL TO WIT MARIJUANA. OFFICERS ALSO DISCOVERED A COMPLETELY EQUIPPED, INDOOR MARIJUANA GROW ROOM AT 139 SCOTT. FURTHERMORE, ON AUGUST 21, 1996, JAMES ELKINS POSSESSED THE KEYS TO BUILDINGS AT 146 NEIL AND 2896 WALNUT GROVE WHICH HE VOLUNTARILY GAVE POLICE. JAMES ELKINS STATED THE BUILDING AT 146 NEIL WAS HIS, BUT REFUSED A CONSENT TO SEARCH AT 146 NEIL BECAUSE, HE SAID, "IT WOULD MAKE IT WORSE ON HIM." OFFICERS EXECUTED SEARCH WARRANTS AT 146 NEIL AND 2896 WALNUT GROVE ON 8/21/96. BOTH LOCATIONS POSSESSED VERY SOPHISTICATED INDOOR MARIJUANA GROW EQUIPMENT. IN EXCESS OF 1,300 MARIJUANA PLANTS WERE FOUND GROWING AT 2896 WALNUT GROVE AND OVER 1,100 MARIJUANA PLANTS WERE FOUND AT 146 NEIL. A MLG & W UTILITY CHECK REVEALED THE UTILITIES AT 2896 WALNUT GROVE WERE IN THE NAME OF RENAISSANCE INVESTMENTS WHICH WAS THE BUSINESS NAME IN FRONT OF 155 AND 139 SCOTT. CONTINUED ON PAGE TWO (2). CONTINUATION OF AFFIDAVIT FOR SEARCH WARRANT FOR: MARIJUANA AND RECORDS PERTAINING TO MARIJUANA AT 1270 TUTWILER. ADDITIONALLY, ON AUGUST 21, 1996, MEMPHIS POLICE OFFICERS EXECUTED A SEARCH WARRANT AT THE HOME OF JAMES AND CAROL ELKINS LOCATED AT 1270 TUTWILER. DURING THIS SEARCH, OFFICERS FOUND THE FOLLOWING: 4 POUNDS OF MARIJUANA, 253.6 GRAMS OF POWDER COCAINE, AND OVER $24,-000 IN U.S. CURRENCY. THE MARIJUANA AND COCAINE TESTED POSITIVE. ON AUGUST 22, 1996, DET. D. TATE OF THE MEMPHIS POLICE DEPARTMENT ORGANIZED CRIME UNIT RETURNED TO 1270 TUTWILER AS OFFICERS WERE VERIFYING DIFFERENT PROPERTIES BELIEVED OWNED BY JAMES AND CAROL ELKINS. DET. TATE OBSERVED AN APPROXIMATELY 4" PLASTIC PIPE EXTENDING THROUGH THE CONCRETE WALL, AT THE SIDEWALK, THAT SURROUNDS 1270 TUTWILER. THIS PIPE EXTENDS ONTO THE ELKINS' PROPERTY AT 1270 TUTWILER. DET. TATE EXAMINED THIS PIPE AND WAS ABLE TO SMELL A VERY STRONG ODOR OF MARIJUANA COMING FROM THIS PIPE. BASED ON THE ELABORATE MARIJUANA GROW FACILITIES OFFICERS FOUND BEHIND A HIDDEN WALL AT 139 SCOTT, AND THE OTHER FACTS STATED ABOVE, THE AFFIANTS BELIEVE JAMES AND CAROL ELKINS MAY HAVE A HIDDEN MARIJUANA GROW OR STORAGE COMPARTMENT AT THEIR RESIDENCE LOCATED AT 1270 TUTWILER. THIS IS LOCATED IN MEMPHIS, SHELBY COUNTY, TENNESSEE. He/She therefore asks that a warrant issue to search the person and premises of the said MALE WHITE, JAMES ELKINS AND A FEMALE WHITE, CAROL ELKINS as above described in said County, where he/she believes said MARIJUANA AND RECORDS PERTAINING TO MARIJUANA is/are now possessed, contrary to the Laws of Tennessee.

Elkins challenges the statement in the affidavit that he voluntarily gave the keys to 146 Neil Street and 2896 Walnut Grove to the police. Although there is a dispute concerning this statement, it is immaterial to the issue under consideration.

Elkins also contests the statement that 1300 marijuana plants were found at 2896 Walnut Grove and 1100 marijuana plants were found at 146 Neil Street. As the warrant authorizing the search of 2896 Walnut Grove has been invalidated, the statement concerning this address will be deleted. *See Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). However, as the warrant authorizing the search of 146 Neil Street has been upheld, this portion of the statement will be retained and considered by the court.

Elkins also strongly objects to the statement that Tate smelled marijuana coming from the pipe in the cement retaining wall outside 1270 Tutwiler. In support he raises the issue of Tate's credibility and cites several court decisions which have questioned Tate's credibility.[48] However, the court notes that Davidson also smelled the marijuana. Thus, Elkins objection is denied.

Elkins also challenges the statement that the affiants believed that the Elkins may have a hidden compartment or marijuana grow at 1270 Tutwiler. In support, he notes the fact that after obtaining the warrant the police did not dig up the ground surrounding the pipe near the sidewalk, which would have been the most logical place to start to find the "hidden" compartment. All of that was done was another search of the Elkins' residence. Elkins' point is well-taken and material. This statement will not be considered in the court's evaluation of whether probable cause remains in the affidavit.

Given these objections raised by Elkins, there is little left in the affidavit presented

in support of the second warrant for the search of 1270 Tutwiler on August 22, 1996, which provide probable cause for its issuance. Although there are valid statements that show that marijuana and associated growing equipment was found at other addresses owned by the Elkins, there is nothing which would indicate that marijuana was present at 1270 Tutwiler. The statement that the police smelled marijuana emitting from a pipe in the cement of a retaining wall located on a public sidewalk simply does not provide a sufficient link to 1270 Tutwiler. Moreover, the failure of the police to dig-up or thoroughly search for the pipe's source undermines the government's position. Accordingly, this warrant must also be invalidated.

## CONCLUSION

The United States argues that the warrants should not be defeated because the officers were rushed in preparing the affidavits and that the mistakes were inadvertent and immaterial. In support, the United States cites *United States v. Charles,* 138 F.3d 257 (6th Cir.1998) and *United States v. Cummins,* 912 F.2d 98, 101–02 (6th Cir.1990). The court cannot agree. The errors in the instant matter are too numerous and they involve significant and material questions which go to the very heart of the Fourth Amendment. Indeed, a brief review of the warrants shows that they consisted of only a few paragraphs at most. As a matter of general observation, it would have taken little time to type such short documents based upon the two months of investigation that the police conducted.

The United States also refers, at least implicitly, to the fact that the officers' actions were supported by the eventual discovery of the great quantities of marijuana and paraphernalia at the various addresses. However, it is a basic principle

D. TATE & R. OLIVER
(signatures)
Sworn to and subscribed before me, this 22nd day of AUGUST 1996

**48.** *See United States v. Smith,* 12 F.3d 215 (6th Cir.1993) (unpublished opinion); *United States v. Restrepo, et al.,* 890 F.Supp. 180 (E.D.N.Y.1995); *United States v. Allen,* Case No. 91–20105–TU (W.D.Tenn.1992).

of law that probable cause cannot be justified after the fact.

With regard to the issue of the use of a thermal imager without a warrant, the court holds that the use of it presented in this case constitutes a search within the meaning of the Fourth Amendment and that such a search requires a warrant. However, even without the evidence provided by the thermal imager, the warrant for 146 Neil Street would still be valid. Further, the court notes that even with such evidence, the warrant for 2896 Walnut Grove would still have been invalidated.

The evidence seized by virtue of the warrants issued for 2896 Walnut Grove and 1270 Tutwiler must be suppressed. However, the warrant issued for 146 Neil Street is upheld..

Accordingly, the defendants' motions to suppress are GRANTED concerning the use of the thermal imager, the lack of exigent circumstances for the warrantless entry at 2896 Walnut Grove, and the warrants for 2896 Walnut Grove and 1270 Tutwiler. However, the defendants' motions to suppress are DENIED concerning the search of 139 Scott Street and the warrant for 146 Neil Street.